Vic WHITE II; Judy Hursh; Susan Lamberson; and Laurie Davis, Plaintiffs,

v.

CONTINENTAL GENERAL INSURANCE COMPANY, a Nebraska corporation, Defendant.

No. 93–CV–0012–B.

United States District Court, D. Wyoming.

Sept. 30, 1993.

Michael B. Rosenthal and John B. "Jack" Speight, of Hathaway, Speight, Kunz & Trautwein, Cheyenne, WY, John E. "Jack" Stanfield, of Smith, Stanfield & Scott, Laramie, WY and Raymond B. Hunkins, of Jones, Jones, Vines & Hunkins, Wheatland, WY, for plaintiffs.

J. Kent Rutledge, of Lathrop & Rutledge, P.C., Cheyenne, WY, for defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

The above-entitled matter having come before the Court upon Defendant Continental

General Insurance Company's Motion for Summary Judgment, and the Court having reviewed the materials on file herein both in support of and in opposition to, having heard oral argument from the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

## I. *Background*

This is a lawsuit initially filed by four Wyoming residents against the defendant Continental General Insurance Company ("Continental"), a Nebraska-based health insurance company.[1] Plaintiffs Vic White II, Laurie Davis and Susan Lamberson each allege that they had an insurance policy with Continental and that Continental has, in bad faith, refused to pay their respective claims for benefits.

Plaintiffs' complaint, seeking both compensatory and punitive damages, sets forth three separate but related claims on behalf of each plaintiff: breach of the insurance agreement, the tort of bad faith and fraud in the inducement. The matter is currently before the Court on Continental's motion for summary judgment as to each claim of White and Davis, and as to Lamberson's claims for breach of contract and bad faith. In addition, Continental filed a motion to dismiss Lamberson's fraud claim under FED.R.CIV.P. 12(b)(6).

▮ This Court has subject matter jurisdiction under 28 U.S.C. §§ 1332(a)(1), (c)(1)[2] (1988), venue is proper in this Court under 28 U.S.C. § 1391(a)(2) (West Supp.1993), and the defendant does not challenge this Court's assertion of personal jurisdiction over it.

The Court notes at the outset that while the plaintiffs joined in this action pursuant FED.R.CIV.P. 20(a), the Court will address the claims of each plaintiff separately for the limited purpose of deciding the motions presently before it.[3]

### A. *Plaintiff Vic White II*

Vic White's claims arise out of Continental's rescission of his policy and their subsequent refusal to pay his medical claims. In May of 1990, White met with Continental insurance agent Ruth Bookout, a close friend of his who handled his personal insurance needs. During his meeting with agent Bookout, White received a brochure describing Continental's coverage, and based on Bookout's recommendation that it was "good coverage at a good price" and White's belief that the premiums were fair, he decided to apply. In filling out the application with the assistance of agent Bookout,[4] White answered all questions relating to his prior medical history "No." He then signed the application attesting that, *inter alia,* all of the information that he provided was true and complete to the best of his knowledge, that he was aware that the information provided in the application would be relied on to determine his insurability, and that he had read the agreement before signing it.

Once the application was received by Continental's underwriting department, a brief telephone interview was conducted with White at which time he again responded "No" to all questions concerning his medical history. In reliance on the answers he gave both in his application and during the phone interview, Continental ceased its background investigation and subsequently issued White a policy with an effective date of May 24, 1990. White admitted at his deposition that on receipt of the policy, he failed to review it in spite of the statement on the policy requesting that he do so. In addition, Conti-

---

**1.** Although no formal documentation was ever filed by the parties, the Court was advised that plaintiff Judy Hursh settled her claims against Continental, and thus, her claims will not be discussed in this opinion.

**2.** The defendant corporation is incorporated under the laws of the state of Nebraska. Thus, for diversity purposes, it is a "citizen" of that state.

**3.** The Court's separate treatment of each plaintiff's claims for the purpose of deciding these

motions should *not* be interpreted by the parties as an opinion on the merits of Continental's subsequent motion to sever. The Court will issue a separate order on that motion at a later time.

**4.** At oral argument, counsel for the plaintiffs advised the Court that Continental's own guidelines required their agents to fill out the questionnaire for the applicant. In other words, the agent would read the questions to the applicant, and would then fill out the application based on what they were told in response to the question.

nental sent a follow-up letter to White asking him to review the policy.

At his deposition, White acknowledged that he never informed Continental of any errors or incomplete answers in his application or his policy.

Upon receipt of his policy, White paid his premiums without incident through December 1991. In the latter part of January 1992, Continental was notified that White had been hospitalized for a thyroid cyst and that a claim would be forthcoming. During a phone conversation, Continental learned for the first time that Mr. White had a history of depression. They were surprised to learn this since White's application stated that he had no prior history of such illnesses. Continental's own underwriting guidelines require the company to decline to insure an applicant who has a history of depression. Continental therefore asserted that if it had known of this condition, it never would have issued a policy to White.

Continental agent Charles Real then began a comprehensive investigation into White's background, which included requesting his medical records from Memorial Hospital of Laramie County as well as from White's personal physician, Dr. Edward Howsher. Review of the records disclosed that White suffered from "manic depression" and was currently taking lithium, a prescription drug. Dr. Howsher responded to agent Real's request for a diagnosis by stating that White had been taking lithium for several years after being hospitalized for a "manic disorder." Real then wrote to White for additional information.

On May 14, 1992, White acknowledged that he had been taking lithium because of a "chemical imbalance" from which he suffered.[5] In July 1992, Real wrote to White and advised him that Continental was going to rescind his coverage due to alleged misrepresentations contained in his application for coverage, unless he provided them with documentation to the contrary. White never responded, and later that month, Continental did, in fact, rescind his coverage. The basis

for rescission was that White materially misrepresented his medical history and that Continental, in accordance with its own guidelines, would never have issued him a policy had they known of this condition.

### B. *Plaintiff Laurie Davis*

Laurie Davis' claims are similar in many respects to the claims of White. They arise out of Continental's rescission of her policy and its subsequent refusal to pay her claims.

Sometime prior to March 20, 1990, Davis met with Continental agent Lisa St. Martin–Cook in Jackson, Wyoming. Based on the recommendations of Cook, Davis applied for coverage. As was the case with White, Davis filled out the application by responding to questions that Cook asked her. In response to the question of whether she was a cigarette smoker Davis responded "No." After they completed this process, Davis signed the application, attesting to the same things that White did. A telephone follow-up interview was conducted shortly thereafter, and Davis again responded "No" when asked if she was a smoker.

Based on her representations, Continental concluded that no further investigation was necessary, and Davis was issued a policy at the non-smoker rate, effective April 1, 1990.

Davis filed several claims with Continental in the following months. It was not until August 1991 that Continental discovered that Davis allegedly misrepresented her answer to the question regarding her cigarette smoking history. During the course of a routine investigation of her medical records as part of another claim she submitted, Continental learned that a Dr. Hayse had advised her to "discontinue cigarettes." The underwriting department was notified, and they indicated that had they known of her smoking history, she would have still been issued a policy, but with a higher monthly premium.

Continental wrote to Davis for information regarding her smoking history, and she responded that she smoked two to five ciga-

---

**5.** Dr. Howsher also referred to White's condition as a "chemical imbalance" in both his letter to agent Real and at his deposition.

rettes a day, on and off, for a period of five years. Based on this information, Continental advised Davis on January 22, 1992 that it would rescind her coverage in twenty days unless contrary information regarding her smoking history was received.[6] Since Davis did not respond to this request, her coverage was rescinded.

### C. *Plaintiff Susan Lamberson*

Susan Lamberson's claims in this suit are slightly different from the claims of White and Davis. Lamberson had health insurance coverage through a group policy which she obtained through the business that she and her former husband owned. After their divorce, her ex-husband purchased a short-term policy for her which expired in May 1991.

In May 1991, Lamberson sought out new health coverage since her prior coverage had expired. She investigated Blue Cross/Blue Shield but testified at her deposition that because they had a 60–day waiting period, she decided to investigate other companies. On June 20, 1991, she contacted Continental agent Gordon Stoddard[7] and requested a brochure describing their health coverage. On July 2, 1991, she made an appointment to meet with Stoddard to discuss the possibility of applying for coverage.

At that meeting, Stoddard first went over the brochure that he sent to Lamberson and when he asked her whether she had any question regarding the brochure, she said that she understood everything and that she wanted to apply for coverage. Stoddard then assisted Lamberson with her application by reading her the questions and filling in the answers accordingly. In response to a specific question in the application, she acknowledged that she had experienced a sei-

zure back in 1980 and that she had taken the drug Dilantin since then to control future attacks.

After completing the application, Lamberson elected not to review the answers Stoddard had entered for her; she stated that she understood the application and then signed it, attesting to the same things Davis and White did. She then gave Stoddard a check to cover her initial premium payment, and asked what the effective date would be. He stated that he could go ahead and put the policy into effect that day if she wanted, and she agreed. He memorialized the effective date on the policy to be issued to her.

At her deposition, Lamberson testified that on July 3, 1991, she felt some tingling in her hands, and that the next day, she noticed some numbness around the left side of her mouth. She went to a physician five days later, and was diagnosed with a brain tumor. On July 16th, she underwent surgery in an effort to remove the tumor.

Continental did not receive her application until July 8th. As a result of her statement that she had a seizure, Continental's underwriters requested her medical records from her physician, Dr. Emch. These records were reviewed by Mark Dudley, an underwriter for Continental. While the records confirmed that Lamberson had in fact experienced a seizure in 1980, a fact that she admitted at her deposition, they also disclosed that she had used cocaine and LSD in the distant past, as well as marijuana as late as June 1989, approximately two years prior to her application for coverage with Continental.[8]

---

6. Unlike White's case, where Continental contended it would have denied him coverage *ab initio*, Continental admitted that it would have still issued Davis her policy had she disclosed the information regarding her smoking background, but the premiums would have been higher. Counsel for Continental indicated at oral argument that once a policy has been issued, which was in part based on an alleged misrepresentation by the insured, it was the company's general practice to rescind coverage altogether rather than to re-issue a new policy at the higher rate. Rescission was the preferred approach in order

to discourage people from concealing material information in the hopes that if their concealment was discovered later, they would still remain covered, albeit at a higher rate.

7. Continental has not contested the fact that Stoddard was in fact an agent of its company who was authorized and empowered to act on its behalf.

8. Lamberson admitted at her deposition that these statements in her medical records regarding prior illicit drug use were correct.

Dudley concluded that, based on her medical history, and specifically her prior drug usage, Lamberson's application should be denied because she posed too great of a health risk to the company. Dudley also testified that in making the decision to decline coverage to Lamberson, he did not review any material, nor did he have any knowledge, that she had been diagnosed with a brain tumor.

Because Continental contends that Lamberson was not insured, it has refused to pay out any claims that she has submitted.

## II. *Standard of Review*

### A. *The Requirements of Rule 56(c)*

Pursuant to Rule 56(c), a trial court hearing a motion for summary judgment is simply required to determine if there are any "genuine issues of material fact," and whether the moving party is entitled to "judgment as a matter of law.". FED.R.CIV.P. 56(c). In deciding a summary judgment motion, the Court must therefore make two separate inquiries. First, are the facts in dispute "material" facts, and if so, does the dispute over these material fact create any "genuine" issues for trial.

In determining materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Carey v. United States Postal Serv.,* 812 F.2d 621, 623 (10th Cir.1987). Factual disputes over collateral matters will therefore not preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (citation omitted).

■ If the Court concludes that the fact in dispute is a "material" fact, then the Court must determine whether the issue is a "genuine" issue of fact that must be resolved by a jury. This requires a court to assess whether the evidence presented is such "that a reasonable jury could return a verdict for the nonmoving party." *Id.* This inquiry focuses on the sufficiency of the evidence as well as its weight. In the absence of "any significant probative evidence tending to support the

complaint," *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968), summary judgment is warranted. The Supreme Court has noted that assessing whether an issue is genuine under Rule 56(c) is similar to standard used for deciding a motion for a judgment as a matter of law, formerly known as a directed verdict, under Rule 50(a). *See Celotex Corp v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (citation omitted). The primary difference between a Rule 56(c) motion and a Rule 50(a) motion is procedural; the former is based on documentary evidence while the latter is based on evidence admitted at trial. *Bill Johnson's Restaurant, Inc. v. NLRB,* 461 U.S. 731, 745, 103 S.Ct. 2161, 2171, 76 L.Ed.2d 277 (1983). Thus, it is apparent that the ultimate determination is whether reasonable minds could differ as to the import of the evidence; if they cannot, then there is no "genuine" issue of fact and summary judgment is proper.

■ This approach to ruling on a motion for a directed verdict, adopted in the summary judgment context, represents a repudiation of what had been known as the "scintilla of evidence" standard. Under that standard, the production of any evidence, without regard to its probative value, which created an issue of fact, required a trial judge to deny a motion for a directed verdict and let the jury decide. *See Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511–12 (adopting several old Supreme Court precedents on the standard for a directed verdict in the summary judgment context) (citations omitted).

■ The trial court's role is limited to determining the existence *vel non* of a genuine issue of material fact, and nothing more. The Court does not assess the credibility or the probative weight of the evidence that established the existence of the genuine issue of material fact. The determination that a true factual dispute exists means, *ipso facto,* that summary judgment may not be entered "as a matter of law," and the case must therefore be submitted to a jury.

### B. *The Burdens of Proof*

The initial burden of production under Rule 56(c) is on the moving party. That

party must make a sufficient "showing" to the trial court that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53. The movant satisfies its burden by producing evidence that is admissible as to content, not form, identifying those portions of the record, including the pleadings and any material obtained during discovery, that demonstrate the absence of any genuine issues of material fact. *Id.* at 323–24, 106 S.Ct. at 2552–53.

If the movant meets its burden of production, then the burden of production shifts to the nonmoving party. That party "may *not* rest upon the mere allegations or denials of his pleadings" to avoid summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis added). The nonmoving party is now put to their proof; it must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985) (citations omitted). It must make a "sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Carey,* 812 F.2d at 623. It must demonstrate to the Court's satisfaction that the "evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 623. In making this determination, the trial court must "examine the factual record and [draw all] reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Dorrance v. McCarthy,* 957 F.2d 761, 762 (10th Cir.1992) (quoting *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230 (10th Cir.1990)).

The Court will now apply these legal standards to the facts of the case before it.

### III. *Discussion*

#### A. *Defendant's Motion for Summary Judgment on the Claims of Plaintiff White*

##### 1. *Breach of Contract Claim*

·Defendant Continental asserts that it is entitled to summary judgment on White's claim that it breached their contract by rescinding his coverage and failing to pay his claims. Continental bases its argument in large part on the Wyoming insurance laws, specifically WYO.STAT. § 26–15–109(a) (1991), which states in relevant part that:

(a) Any statements and descriptions in any application for an insurance policy ... by or in behalf of the insured ... are representations ... Misrepresentations, omissions, concealment of facts and incorrect statements do not prevent a recovery under the policy or contract unless either:

(i) Fraudulent; *or*

(ii) *Material either to the acceptance of the risk,* or to the hazard the insurer assumes; or

(iii) The insurer *in good faith,* if it knew the true facts as required by the application for the policy ... would not have:

(A) Issued the policy or contract;

(B) Issued it at the same premium rate.... (emphasis added)

##### a. *Duty to Investigate*

In its motion, Continental asserts several bases in support of its position that it was entitled to rescind the contract. Initially, Continental contends that it was entitled to rely on the answers that White gave in his application for coverage, which includes the subsequent telephone call and, by negative implication, his failure to respond to the follow-up letter. Continental disputes the assertion that it was under a duty to investigate the answers he gave in his application when the application was submitted, especially where Continental had no reason to assume that White's answers were not truthful or accurate. In support of this contention, it relies on *Bageanis v. American Bankers Life Ins. Co. of Florida,* 783 F.Supp. 1141 (N.D.Ill.1992). In that case, the Court stated that, under Illinois law, an insurer is under no general duty to investigate the truthfulness of an applicant's responses unless it has notice that those responses might not be truthful or accurate. *Id.* at 1146. This Court agrees.

■ At a minimum, Mr. White knew that he had a "chemical imbalance." He had am-

ple opportunity to consult with the defendant, or anyone else, about whether this condition was encompassed by the questions on the application. He is, in effect, asking this Court to impose a duty on insurance companies to investigate the truthfulness of each and every answer to every question in an application for coverage. Although the Tenth Circuit has not spoken to this issue as of the date of this order, this Court is inclined to follow the rulings of the other appellate and trial courts that have considered this issue and have rejected this position, concluding that the insurer is entitled to rely on an insured's representations. *See, e.g., Verex Assurance, Inc. v. John Hanson Sav. and Loan, Inc.*, 816 F.2d 1296, 1305 (9th Cir.1987) (Oregon law); *Bageanis*, 783 F.Supp. at 1146 (Illinois law) (citations omitted); *Twin City Bank v. Verex Assurance Inc.*, 733 F.Supp. 67, 71 (E.D.Ark.1990) (interpreting ARK.CODE ANN. § 23–79–107(a) (Michie Supp.1989) which is verbatim to Wyoming's statute); *Mutual Benefit Life Ins. Co. v. Morley*, 722 F.Supp. 1048, 1054 (S.D.N.Y.1989) (New York law); *In re EPIC Mortgage Ins. Litigation*, 701 F.Supp. 1192, 1245 (E.D.Va.1988) (North Carolina law), *aff'd in part, rev'd in part on other grounds sub nom. Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118 (4th Cir.1990). As the court in *Bageanis* said, the insured was the one who had the burden "to supply complete and accurate information to the insurer." *Bageanis*, 783 F.Supp. at 1164 (citations omitted). Therefore, the Court concludes that the insurer did not have a duty to investigate and thus was entitled to rely on White's representations. This, however, does not end this Court's analysis.

### 2. Rescission

#### a. Material Misrepresentation

▪ ▇▇▇▇ Defendant next contends that WYO. STAT. § 26–15–109(a) (1991) permits it to re-scind White's coverage based on White's alleged misrepresentations as to his medical history.[9] White argues that he understood his condition to be a chemical imbalance, which is what he was told by his physician, Dr. Howsher. He also claims that he thought that the lithium that he took was more like a vitamin or a daily supplement, rather than "medication" per se. As a result, he claims that he had no intent to misrepresent the fact that he had a mental condition since he did not consider it as such. In support of his position, he cites cases from other jurisdictions that have held that intent to deceive by the insured must be proven before the insurer may rescind. *See, e.g., Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 887 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 279, 116 L.Ed.2d 230 (1991) (Texas law); *City Nat'l Bank v. Jackson Nat'l Life Ins.*, 804 P.2d 463, 466 (Okla.Ct. App.1990) (citing prior Oklahoma decisions).

While this Court recognizes that other state and federal courts have adopted one view of what is required for rescission—that intent is necessary—this Court, sitting in the state of Wyoming in a case involving Wyoming substantive contract law, is compelled to follow the rulings of the Wyoming Supreme Court. Regardless of whether this Court agrees with the position taken by other courts, this Court is bound to follow Wyoming precedent when it is clear, on point and controlling. *All American Life & Casualty Co. v. Krenzelok*, 409 P.2d 766 (Wyo.1966) is such a case, and is dispositive on this point.

In *Krenzelok*, the Wyoming Supreme Court dealt with the precise issue before this Court. The insured in that case was an elderly foreign woman who could neither read nor write the English language. It was unclear to the Court from the record wheth-

---

9. The statute does not expressly state which party has the burden of proof. The way in which the statute is worded, however, makes it apparent that the insurer is the party who must prove that it qualifies under one of the subsections of WYO.STAT. § 26–15–109 (1991), rather than the insured having to prove that the statute does not apply. This Court interprets subsection (a) as establishing a rebuttable presumption in favor of the insured that recovery is permitted even where there are omissions or misrepresentations *unless* an exception is met. This Court thus concludes that the Wyoming statute implicitly places the burden of proof on the defendant-insurer. An Oklahoma intermediate appellate court reached the same conclusion with respect to Oklahoma's analogous statute. *See City Nat. Bank v. Jackson Nat. Life Ins.*, 804 P.2d 463, 466 (Okla.Ct.App.1990).

er she even understood the application for health insurance coverage that she signed. She died from a cerebral hemorrhage almost one year after the defendant issued her an insurance policy. In response to a question in the application concerning whether the applicant had ever received medical treatment in the past, she answered "Yes" and indicated only that she had cataract surgery a few years earlier. In reality, she had been hospitalized three other times—once for congestive heart failure, once for fractured ribs and once for bronchopneumonia. None of these hospitalizations were disclosed, and based on these nondisclosures, the defendant insurance company refused to pay her claims.

The insurance company argued that her nondisclosures amounted to misrepresentation/concealment and fraud. The Court did not need to reach the fraud issue, however, since the insurance company proved that the concealment was material to the risk. On that basis, and that basis alone, the Court concluded that "concealment of facts *material to the risk* will avoid the policy even though the concealment was the result of *inadvertence or mistake and was entirely without fraudulent intent.*" *Id.* at 768 (citations omitted) (emphases added).

■ *Krenzelok,* a case decided one year before the Wyoming legislature adopted § 26–15–109, and which influenced the drafting of that statute, therefore stands for the proposition that if the insurer can show that the concealment was "material" to the insurance risk at issue, then any concealment by the insured, even if made in good faith, will justify rescission of the coverage by the insurer. Other courts have reached the same conclusion in interpreting similar state statutes. *Bageanis,* 783 F.Supp. at 1145 ("A good faith mistake does not excuse a material misrepresentation"); *Massachusetts Mut. Life Ins. Co. v. Nicholson,* 775 F.Supp. 954, 959 (N.D.Miss.1991) ("If the misstatement is material, it can make no difference as to whether or not it was made in good faith") (citations omitted). Stated another way, proof of intent is not necessary to rescind

under *Krenzelok* as long as the insurer can prove that the concealment was "material"[10] to the insurance risk involved. While the rule enunciated in *Krenzelok* may be a considered a harsh one, it is nonetheless the prevailing law of Wyoming which this Court must follow and apply in this case.

Thus, the issue now becomes whether the concealment at issue was "material" to the risk involved. At the outset, the Court notes that the statute does not define materiality. Therefore, it is left to the courts to fashion a definition. "Materiality" in this context has been defined as a risk that would have influenced a prudent insurer in determining whether to accept the risk in the first place. *See Nicholson,* 775 F.Supp. at 959 (citations omitted); *see also Nappier v. Allstate Ins. Co.,* 961 F.2d 168, 170 (11th Cir.1992); *Bageanis,* 783 F.Supp. at 1145 (" 'Materiality' is determined by asking whether reasonably careful and intelligent persons would have regarded the omitted facts as substantially increasing the chances of the events insured against so as to cause rejection of the application or different conditions, such as higher premiums.") (citations omitted).

In its motion for summary judgment, Continental contends that the risk concealed by Mr. White was material as a matter of law. Mr. White disputes this point for the simple reason that nondisclosure of his mental condition and lithium intake was completely unrelated to the thyroid condition for which he submitted a claim that led to the rescission of his policy.

Since this Court is hearing this case on a motion for summary judgment, its only role is to determine if any disputes of material fact exist, not to resolve such disputes. While various courts have acknowledged that the determination of "materiality" is usually a question of fact for the jury to decide, summary judgment is nonetheless appropriate where the misrepresentation "is of such a nature that there can be no dispute as to its materiality." *Bageanis,* 783 F.Supp. at 1145 (citations omitted).

---

**10.** Of course, materiality is irrelevant under the plain text of the statute if the insurer can meet the more difficult burden of proving that the

insured had the actual intent to defraud. *Compare* Wyo.Stat. § 26–15–109(a)(i) *with* Wyo.Stat. § 26–15–109(a)(ii).

■ This Court cannot say, as a matter of law, whether the misrepresentation by Mr. White was material. Reasonable minds can differ on this question. Continental asserts that had it known of the disorder, it would have denied coverage; Mr. White asserts that knowledge of his mental condition cannot be material because there is no nexus between the claim and the condition at issue. In the Court's opinion, this is a question to be decided by a jury.

### b. *Good Faith Denial of Coverage From the Outset*

Finally, the Court notes that while Continental primarily sought rescission under the statute on grounds of material misrepresentation, it argued in the alternative that had it known of White's pre-existing condition, it never would have issued him coverage. White, as noted below, vigorously contests this issue.

■ Under the statute, in order to rescind on the basis that coverage would have been denied from the outset, the statute requires the insurer to prove that its actions were undertaken in *good faith*. *See* Wyo. Stat. § 26–15–109(a)(iii)(A) (1991). For reasons set forth below, the issue of whether the defendant acted in good faith in this case cannot be decided on this motion for summary judgment. This is a question of fact for the jury.

### 2. *The Tort of Bad Faith*

#### a. *The Elements of the Cause of Action*

■ The Wyoming Supreme Court first recognized the tort of "first-party bad faith" in *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855 (Wyo.1990). The Court elected to follow the growing majority of states that have adopted this tort, albeit under a variety of names, *see id.* at 857–58 & nn. 4–8, in recognition of the unequal bargaining power of the parties to an insurance contract. The purpose of this tort was to deter bad faith claim practices by insurers. *Id.* at 856. The Court thus concluded that the duty of good faith and fair dealing was an implied term of all insurance contracts because of the special relationship between the parties to this type of contract. *Id.* at 858 (citations omitted).

Having thus adopted the tort of bad faith in Wyoming, the Court went on to enumerate the elements of the cause of action. In order to state a claim under this tort, the plaintiff must establish "[ (1) ] the absence of a reasonable basis for denying benefits of the policy and [ (2) ] the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* at 860.

Under the first element of the tort, the plaintiff must prove unreasonableness. The Wyoming court noted that the "fairly debatable" objective standard of care, enumerated in *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 376–77 (1978), was the best barometer of reasonableness. In *Anderson*, the Court stated that the logical premise of the "fairly debatable" standard is that if a "realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing." *Id.* (citations omitted).

The second element of the test is self-explanatory. It merely establishes that the tort is an intentional one, requiring proof that the defendant's conduct in denying the claims was made either knowing that the claim was not fairly debatable, or with reckless disregard as to whether it was fairly debatable. *Id.* 789 P.2d at 860. Mere negligence by the defendant is insufficient to make out a *prima facie* case of this tort.

#### b. *Application to this Case*

■ Since the tort of bad faith is recognized in Wyoming, and the plaintiffs' pleadings do in fact state a claim for relief based on this tort, the issue now is whether the defendant is entitled to summary judgment on that claim. Continental asserts that its actions were reasonable as a matter of law. It contends that it rescinded the policy only after conducting an investigation and giving Mr. White several opportunities to correct any errors on his application. In essence, Continental contends that the claim submitted by Mr. White was fairly debatable, and as a result, it is entitled to summary judgment.

In his opposition, White contends that he has raised a genuine issue of fact on this point. His main assertion in support of this claim of bad faith is that Continental engages in the practice of what is referred to as "post-claim underwriting," and that this is *prima facie* evidence of the absence of a reasonable basis for denying to pay benefits under the policy. White submitted evidence that standard industry practice is for the insurer to do a comprehensive investigation *before* agreeing to insure a person. White alleges that Continental did not conduct a thorough underwriting until *after* it had issued him a policy. He further alleges that Continental would heavily scrutinize the insured's application only after a claim was submitted by the insured. At that time, Continental would then request medical records and examine the files with a fine toothed comb to see if a pre-existing condition existed that would allow it to refuse to pay out the claim.

During discovery, plaintiff discovered additional evidence to support his contention that Continental engages in post-claim underwriting. First, he learned that Continental had experienced severe financial losses in excess of $8,500,000 between 1988 and 1990. Therefore, post-claim underwriting would allow Continental to increase its revenues by taking on new policyholders,[11] while simultaneously decreasing its expenditures by denying coverage when claims were submitted.

In addition, plaintiff uncovered evidence of what Continental refers to as its "bonus plan." Every Continental underwriter is required to amass 100 points per day in order to keep their job. 2.5 points are awarded if an underwriter either pays or denies a claim; however, 5 points are awarded if the underwriter can find a pre-existing condition that would enable Continental to deny coverage. As a result, plaintiff contends that post-claim underwriting is, in and of itself, *prima facie* evidence of bad faith.

Based on this evidence, this Court concludes that there are genuine issues of material fact relating to post-claim underwriting and the plaintiff's bad faith claim.[12]

White testified at his deposition that he had paid Continental the required premiums for a period of nineteen months. At no time during those months did Continental ever request his medical records, even though he had signed a release as part of his application which authorized Continental to obtain these records. It was not until he submitted a claim for a thyroid problem that his records were requested and his coverage subsequently rescinded for failing to disclose his mental condition, which was unrelated to his thyroid problem. Finally, plaintiff has offered the testimony of Dr. Marshall Reavis III, an insurance expert, who will testify that in his opinion, Continental's actions amount to post-claim underwriting. For these reasons, the Court concludes that summary judgment is inappropriate as to plaintiff's claim of bad faith under *McCullough*.[13]

---

**11.** At oral argument, counsel for plaintiff asserted that Continental's revenues in the form of new premiums had increased by approximately 300% from 1988 to 1990, the period of its losses.

**12.** The Court also notes that defendant moved for summary judgment on plaintiffs' claims for punitive damages. Given the Court's conclusion that there is a jury issue as to Continental's liability for bad faith, which is an intentional tort, it follows that Continental's motion for summary judgment on the punitive damages claim must also be denied.

**13.** The Court is aware of the Wyoming Supreme Court's recent decision in *Hatch v. State Farm Fire & Casualty Ins. Co.*, 842 P.2d 1089 (Wyo. 1992) which held that insurance companies can still be liable for bad faith in their "investigative tactics and their general handling of [plaintiff's] claims," even if the claims themselves are fairly

debatable. *Id.* at 1096. In other words, *McCullough* relates to bad faith in refusing to pay a claim, whereas *Hatch* deals with bad faith in the claims process.

Under *Hatch*, if the insurer engages in "oppressive and intimidating claim practices," *id.*, then it may still be subject to liability. This Court, as the *Hatch* Court did, interprets the bad faith claims in *Hatch* as being quite similar both in principle and in effect to the tort of intentional infliction of emotional distress, which Wyoming had already recognized in *Leithead v. American Colloid Company*, 721 P.2d 1059 (Wyo.1986). While plaintiffs allege the defendant wrongfully refused to pay out their claims, no allegations have been raised to support a finding that Continental has engaged in any harassing or annoying behavior that would amount to "extreme and outrageous" conduct, or "oppressive and intimidating" practices. As a result, summary judgment is appropriate as to this aspect of the plaintiff's claim for bad faith. As noted in the body of

### 3. Fraud Claims

The plaintiff also asserted a cause of action in his complaint for fraud.[14] The defendant has moved for summary judgment on this claim, alleging two grounds in support of its position. First, defendant asserts that there was no intent to deceive on its part. Second, Continental argues that no misrepresentations were made as to any *existing* facts that would support a claim of fraud.

Defendant's first claim regarding intent was rejected by the Court in its discussion regarding the viability of the bad faith claim.

▉ As to defendant's second claim, it is well-settled law in Wyoming that in order to constitute fraud, "there must be a false or fraudulent statement or misrepresentation or concealment of a material fact, made by the defendant to induce action or inaction, which was reasonably and justifiably believed to be true by the plaintiff, and relied upon by the plaintiff to his damage." *Davis v. Consolidated Oil & Gas, Inc.*, 802 P.2d 840, 851 (Wyo.1990) (citations omitted). As a general rule, the allegedly false representations relied on by the plaintiff must relate to existing facts, and mere promises in the future are insufficient. *See Waters v. Trenckmann*, 503 P.2d 1187, 1190 (Wyo.1973); *see also Johnson v. Soulis*, 542 P.2d 867, 872 (Wyo.1975) ("The general rule is that fraud ordinarily cannot be founded upon a representation which is promissory in nature."). Continental argues that the only conceivable misrepresentation that plaintiff could allege would relate to future conduct (non-payment of claims), as opposed to existing facts. Wyoming case law undercuts this contention.

▉ There is a genuine factual dispute as to whether Continental knowingly, with the intent to deceive White, made a material misrepresentation as to an existing fact. The Wyoming Supreme Court acknowledged in *Johnson* that while the general rule is that promises in the future cannot support a claim for fraud, that rule is "subject to an exception to the effect that if the representation, although promissory in nature, is made *with no intention of performing it or with a present intention not to perform*, it may then serve as a foundation for an action in fraud...." *Id.* at 872 (emphasis added). The rationale is that the promisor's intention not to perform is itself a misrepresentation of an existing fact. *Id.* (citations omitted). Whether the defendant, acting through its authorized agents, had an intention (or lack thereof), is a question of fact for the jury to decide.

For the aforementioned reasons, this Court concludes that the defendant's motion for summary judgment as to the claims of Mr. White must be denied.

### B. Defendant's Motion for Summary Judgment on the Claims of Plaintiff Davis

The Court, as well as the defendant, considers the claims of Laurie Davis to be similar in all relevant respects to the claims of Vic White. In that regard, the Court's analysis on defendant's motion for summary judgment is the same.

▉ As to the breach of contract claim and Continental's attempted rescission, the Court concludes that there is an issue of fact as to whether the Davis' misrepresentation was "material." Like White, Davis' concealment was unrelated to the claim that she filed which led to her policy being rescinded.[15] In her case, the claim she submitted was for a muscle injury, and the condition that she allegedly failed to disclose was that she was a smoker.

In addition, WYO.STAT. § 26–15–109(a)(iii)(B) (1991) states that but-for the

---

this order, whether plaintiff will recover on its claim of bad faith claim under *McCullough* is for the jury to decide.

**14.** Plaintiffs also assert that Continental's plan of post-claim underwriting supports their fraud claim.

**15.** The facts with respect to Davis' claim may even make out a stronger argument on her be-

half. In her opposition, Davis noted that she had filed several claims with Continental before the claim that led to her policy being rescinded. Plaintiff asserted at oral argument that each of her prior claims had been for an amount less than her deductible so that Continental did not have to pay anything out of its pocket. The claim that led to her policy being rescinded, however, was for an amount well in excess of her deductible.

misrepresentations, if the insurer in good faith would have issued the insured a policy at a different rate, then it is entitled to rescind. As noted above, however, whether Continental acted in good faith is a question of fact for the jury. If it can prove good faith at trial, then it may prevail; but this Court cannot decide that question as a matter of law on these facts.

The Court will also deny the defendant's motion for summary judgment with respect to the bad faith given that there is a question of fact as to whether the defendant engaged in post-claim underwriting. Finally, since there is a factual question over the existence of a misrepresentation and the defendant's intent, discussed above, summary judgment will be denied on this claim.

## C. Defendant's Motion for Summary Judgment and Motion to Dismiss the Claims of Plaintiff Lamberson

Continental filed a motion to dismiss the breach of contract and bad faith claims of Susan Lamberson, and a motion to dismiss her claim of fraud pursuant to FED.R.CIV.P. 12(b)(6).

### 1. Breach of Contract Claim

As noted above, Lamberson's claim for breach of contract is somewhat different from the claims of White and Davis. Continental did not contest the fact that White and Davis were issued coverage at the outset; the issue with respect to them was the propriety of the subsequent rescission. Continental's main contention with respect to Lamberson is that there was no contract between the parties. Thus, Lamberson must carry an additional burden of proof that White and Davis do not. She must demonstrate that a contract existed between her and Continental and that therefore, Continental was under an obligation to pay her claims.

Continental sets forth three different bases on which it is entitled to summary judgment as to Lamberson's breach of contract claim: (1) no contract ever formed; (2) even if a contract was formed, rescission was proper; and (3) the 15–day exclusionary period in the brochure relieves Continental of liability for her claims. The Court will discuss these claims seriatim.

#### a. Promissory Estoppel

Continental asserts that it declined to issue Lamberson a policy when it learned that she failed to disclose her prior drug usage. As a result, it argues that no contract was ever formed. In support of this position, Continental notes that no binder was ever issued, and that it simply never accepted her application for coverage. In contract terminology, her application was only an offer to contract, and since that offer was never accepted, no contract was ever formed.

Lamberson vigorously asserts that this Court should find that an equitable contract was created between her and Continental through the doctrine of promissory estoppel. She argues that she detrimentally relied on both the representations made by agent Gordon Stoddard as well as Continental's brochure, which purports to represent certain aspects of coverage that are disclaimed elsewhere in the brochure. Moreover, she asserts that her reliance was both reasonable and justifiable under the circumstances. Finally, her allegation of detriment stems from the fact that since she reasonably believed she was covered on July 2nd based on her meeting with agent Stoddard, she turned down an offer for coverage from Blue Cross/Blue Shield, a company she had investigated earlier, which she received just a few days after her meeting with Stoddard. She therefore contends that her detrimental reliance is sufficient to support a finding that a contract existed. This Court agrees.

In *Provence v. Hilltop Nat'l Bank*, 780 P.2d 990 (Wyo.1989), the Wyoming Supreme Court stated that:

> [t]he essential elements of promissory estoppel are well established: (1) a clear and definite agreement; (2) proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and (3) a finding that the equities support the enforcement of the agreement.

*Id.* at 993 (citation omitted); *see also Inter-Mountain Threading v. Baker Hughes*, 812 P.2d 555, 559 (Wyo.1991) (citing cases). This is the position taken by the drafters of § 90

of the Restatement (Second) of Contracts, which the Wyoming Supreme Court has adopted in a line of cases. *See Tremblay v. Reid,* 700 P.2d 391, 395 n. 1 (Wyo.1985) (citing cases); *see also B & W Glass v. Weather Shield Mfg. Inc.,* 829 P.2d 809, 818 (Wyo. 1992) (characterizing *Tremblay* as having "adopted the principles" of § 90 of the Restatement). Finally, the party asserting the estoppel has the burden of proving the three elements. *Id.*

 Lamberson has produced evidence to support a finding that a "clear and definite agreement" existed between her and Continental. She testified at her deposition that Stoddard represented to her that she was covered, that she asked him to make the policy effective immediately, that she gave him a check to cover the initial premium payment, and most significantly to this Court, that he orally represented that her check was sufficient to allow coverage to be effective that day, and that he memorialized the effective date on the policy that she was to have been issued. The check was payable to the order of Continental General, and was subsequently cashed. Finally, while not dispositive, this Court is also persuaded by Lamberson's testimony that based on her

meeting with Stoddard, she believed that she was covered when she left his office. Stoddard's alleged representations are a far cry from the mere "expressions of opinion" that the Wyoming Supreme Court has held to be insufficient to support a claim of promissory estoppel. *See Baker Hughes,* 812 P.2d at 559 (citing cases).

 Lamberson must next prove that her reliance was reasonable and detrimental. This Court cannot say as a matter of law that her reliance was reasonable or not for reasons set forth above. In addition, Lamberson testified at her deposition that her decision not to elect coverage from Blue Cross/Blue Shield was *precisely because* she believed she was covered by Continental.

 The third element requires this Court to assess, as a matter of law, whether the equities of the case justify application of the doctrine of promissory estoppel. *See Baker Hughes,* 812 P.2d at 560 (citation omitted). In light of the evidence set forth above, this Court concludes that the detriment Lamberson incurred as a result of her meeting with Stoddard, and her reliance on his representations, is sufficient to warrant the application of promissory estoppel.[16]

---

**16.** In its brief and at oral argument, counsel for Continental argued that under Wyoming law, insurance coverage may not be extended by waiver or estoppel, citing *inter alia, St. Paul Fire & Marine Ins. Co. v. Albany County Sch. Dist. No. 1,* 763 P.2d 1255 (Wyo.1988) and *Ricci v. New Hampshire Ins. Co.,* 721 P.2d 1081 (Wyo.1986) in support of its position. While counsel's recitation of the law is correct, these cases are completely inapposite to the case at bar and Continental's reliance on them represents a fundamental misunderstanding of the holdings of these cases.

*St. Paul* and *Ricci* do not stand for the broad proposition that *promissory* estoppel cannot be applied in the context of insurance contracts. In fact, those cases never even use the term "promissory," for the apparent reason that they are not discussing promissory estoppel, but something more akin to equitable estoppel. Thus, counsel's reliance on these cases as dispositive precedent is misplaced.

Those cases discuss estoppel and waiver in the situation where a court initially determines that an insurance policy is clear on its face and does not cover specific claims submitted by an insured. Estoppel or waiver then arise when the insured tries to argue, in a last-ditch effort, that the insurer has waived, or should be estopped,

from relying on the policy that has already been adjudged to be favorable to the insurer. In both cases, the Wyoming Supreme Court has reaffirmed its precedents, holding that conditions relating to coverage cannot be extended by acts of the insurer or its agent under the doctrines of estoppel or waiver. *St. Paul,* 763 P.2d at 1261; *Ricci,* 721 P.2d at 1086–87. This is entirely consistent with the concept of equitable estoppel, which embodies the principle that a party who knows the truth of a matter is absolutely precluded from denying or contradicting that matter at a later time. *See* 28 Am.Jur.2d *Estoppel and Waiver* § 27 (1966). The motivation behind this rule is readily apparent. It is an effort to prevent an insured who has lost on the merits of his insurance contract claim from circumventing that adverse ruling by attempting to deny the insurer the right to rely on the terms of the policy, which has already been interpreted in the insurer's favor.

Thus, it is apparent that these cases stand for the proposition that equitable estoppel cannot serve as a basis for an insured to implicitly extend the scope of his policy, contrary to its express terms. These cases are simply irrelevant to the issue currently before the Court, which is whether Susan Lamberson may assert that a contract was formed with Continental on the basis of *promissory* estoppel.

### b. The 15–Day Exclusionary Period

 Continental's final argument is that even if a contract was formed, the brochure contained a specific 15–day exclusionary period that relieves them from liability. The brochure states, in relevant part, that the insurance plans cover "Injuries received after the Policy Effective Date and Sickness manifesting more than 15 days after the Policy Effective Date." Continental asserts that this clause clearly disclaims any and all responsibility on their part for claims of sickness arising within 15 days of the issuance of a policy. In this case, Lamberson's coverage allegedly began on July 2, 1991, and plaintiff does not contest the fact that the tumor manifested itself within the 15–day period.

Lamberson disputes the meaning of the exclusionary period. She submitted testimony that her understanding of the 15–day period was that it was a waiting period or a deductible, and not a wholesale exclusion of coverage. She believed that if she submitted for sickness manifesting itself within the 15 day period, Continental would, on the 16th day, pay out her claims. In other words, she was responsible for costs incurred during those 15 days, but Continental would assume responsibility on the 16th day.

While this is a close question, this Court has determined that Lamberson's interpretation is simply unreasonable as a matter of law. While she has presented *some* evidence tending to create an issue of fact as to the meaning of the exclusionary period, the Court is of the opinion that this evidence is legally insufficient to create a *genuine* issue of material fact. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (requiring a court to assess whether the evidence presented is such "that a reasonable jury could return a verdict for the nonmoving party").

The language of the exclusionary period expressly states that Continental's coverage for sickness, as opposed to injuries, only applies if the sickness manifests itself more than 15 days after the effective date of coverage. Lamberson has not disputed the fact that her tumor did manifest itself within the 15–day period.[17]

At her deposition, Lamberson admitted that she received a copy of the brochure during her meeting with Stoddard. Furthermore, Stoddard gave uncontradicted testimony at his deposition that he went through the brochure with Lamberson and explained the relevant provisions, including the 15–day exclusionary period. When asked whether Lamberson asked any questions regarding the 15–day period, Stoddard stated that she did not. In his words, she seemed to understand exactly what the 15–day period meant and never expressed any confusion over what it meant.

Stoddard further testified that in order to illustrate the 15–day exclusionary period, he told Lamberson a story about another woman who became ill and who filed a claim 16 days after her policy was issued. Continental initially denied coverage since the understanding was that the woman's illness had manifested itself before the 16th day. In fact, the 16th day was the day that the woman sought treatment from a physician, and first learned she had pneumonia. Upon learning of this, Continental proceeded to pay her claim. Finally, Lamberson acknowledged at her deposition that Stoddard told her this story.

The only evidence that Lamberson has produced in attempting to establish that there is an issue of fact as to the exclusionary period is that her subjective understanding

---

In addition, counsel's argument that "estoppel" cannot be used to *extend* coverage is illogical in this case since it begs the question currently before the Court, which is whether she even has coverage at all, not what the extent of her coverage is.

Finally, it is inconceivable that *St. ·Paul* and *Ricci* could support Continental's broad assertion in light of the fact that the Wyoming Supreme Court's most recent decisions on the topic of estoppel have acknowledged the vitality of promissory estoppel without making an excep-

tion for insurance contracts. *See, e.g., B & W Glass*, 829 P.2d at 818; *Baker Hughes*, 812 P.2d at 559.

17. This is so regardless of what date is considered the date that the tumor "manifested" itself. The latest possible date that it could be said to have manifested is July 10, 1993, the day she was diagnosed with this condition, which was only eight days after her coverage allegedly became effective.

of the 15–day period was that it was a "waiting period." This, standing alone, is insufficient to create a genuine issue over the meaning of this phrase. The terms establishing this 15–day exclusionary period are clear on their face, and they must be given effect by this Court.

The party seeking coverage is the party responsible for reading the relevant material, including the application and the brochure. If a party, for whatever reason, elects not to read that material, then they bear the risks associated with this decision. The burden of reading and inquiring as to the terms and conditions contained in the brochure was on Lamberson. If she was unclear, then she should have said something. Her understanding is flatly inconsistent with the words of the exclusionary period. Moreover, Stoddard testified that he explained the implications of this exclusionary period to her. In light of his uncontroverted testimony, the fact that he used an anecdote to illustrate what the phrase meant, and Lamberson's failure to inquire as to the meaning of the exclusionary period, this Court concludes that the defendant is entitled to judgment as a matter of law. Lamberson's subjective misunderstanding as to the meaning of the exclusionary period cannot be attributed to the defendant in this case. Therefore, the 15–day exclusionary period serves to relieve the defendant of any liability with respect to Lamberson's claims.

### 2. *Fraud Claim*

Finally, Continental has moved to dismiss her allegations of fraud for failure to state a claim under FED.R.CIV.P. 12(b)(6).

Lamberson opposed this motion, arguing that Continental committed acts of fraud on her in two respects. First, she argues that post-claim underwriting is evidence of fraud. Second, she contends that Stoddard made false and misleading misrepresentations to her on July 2, 1991, the effective date of coverage.

### a. *Standard of Review for a Rule 12(b)(6) Motion to Dismiss*

A motion to dismiss under Rule 12(b)(6) tests only the legal sufficiency of the plaintiff's allegations; it is not a procedure for resolving issues of fact or evaluating the merits of a case. *See* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 (1990). In considering a 12(b)(6) motion, the trial court determines the sufficiency of a complaint as a matter of law. *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir.1986). In order to grant a dismissal pursuant to Rule 12(b)(6), the Court must make the legal determination that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In making that determination, the Court is required to view the facts in the light most favorable to the plaintiff, giving that party the benefit of all reasonable inferences that can be drawn from the facts pled. *Id.* " 'The Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim.' " *Morgan*, 792 F.2d at 978 (citing *Auster Oil & Gas v. Stream*, 764 F.2d 381, 386 (9th Cir.1985)).

Rule 8 sets forth the basic pleading requirements. That rule calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a)(2). Thus, although Rule 12(b)(6) provides for dismissal when the plaintiff fails to state sufficient facts to meet this liberal standard, its "sanction extends only to a formal testing of the legal sufficiency of the factual basis" of the claim. *Auster Oil & Gas*, 764 F.2d at 386. "Granting defendant's motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Morgan*, 792 F.2d at 978. The Court will now apply these standard to Lamberson's fraud claims.

### b. *Application to this Case*

The first basis on which Lamberson alleges fraud is that Continental engaged in post-claim underwriting. There is, however, undisputed evidence with respect to the handling and underwriting of her claims which belies this contention.

There is ample evidence in the record, which Lamberson has not contested, which shows that when Continental received her application for coverage in July, 1991, it im-

mediately requested her medical records. This was because she had disclosed in her application that she suffered a seizure in 1980 and that she was currently taking medication to prevent a recurrence. When Continental's underwriters reviewed her application, they discovered this disclosure and, in accordance with it's own guidelines, promptly requested her medical records. When those records were received, Continental then learned that Lamberson had failed to reveal her prior drug usage, and this was the basis on which they refused to issue her a policy.

Thus, regardless of the viability of White and Davis' claims of fraud based on post-claim underwriting, the uncontradicted evidence in this case is that Lamberson was underwritten up front. Therefore, Lamberson's claim of fraud cannot be predicated on post-claim underwriting.

Her next argument is that Stoddard misrepresented the status of her coverage on July 2, 1991. She asserts that Stoddard told her that she was covered when, in fact, she was not. This contention is also belied by the evidence in the record. At his deposition, Stoddard testified that he explained the terms of the brochure to Lamberson, which included the 15–day exclusionary period. There is no evidence from either his deposition or Lamberson's own deposition that Stoddard falsely represented to her that she was covered when she was not covered.[18]

The reality of the situation is that when Susan Lamberson left Stoddard's office on July 2, 1991, she was covered—for injuries occurring arising at any time. Her coverage for sicknesses, however, was subject to the 15–day exclusionary clause. There is no evidence in support of Lamberson's contention that Stoddard misrepresented the status of her coverage to her on July 2, 1991. The only representations that he made were entirely consistent with the scope of her coverage. Her claim for fraud must therefore be dismissed for failure to state a claim on which relief can be granted. It is apparent

that Lamberson cannot allege any facts on which a claim of fraud may be predicated.

### D. *Conclusion*

Summary judgment on the breach of contract claims of plaintiffs White and Davis is unwarranted. There are genuine issues of material fact relating to the propriety of rescission by Continental, including whether the misrepresentations by White and Davis, which were unrelated to the claims submitted, can be considered "material" misrepresentations and whether Continental would have, in good faith, denied to issue White and Davis coverage had it been aware of these conditions. *See* WYO.STAT. § 26–15–109(a)(ii)–(iii) (1991).

Summary judgment on the bad faith claims is also improper since there are issues of fact for a jury to decide, most of which relate to the allegations of post-claim underwriting. In addition, there are issues of fact relating to the claims of fraud, which include post-claim underwriting as well as what Continental's intent at the time of the issuance of the policies was, and therefore, summary judgment must be denied on those claims.

The Court has, however, concluded that summary judgment is proper as to the contract claims of plaintiff Susan Lamberson. While there are factual issues relating to whether she detrimentally relied on the representations of Continental agent Gordon Stoddard, the Court concludes that even if this issue was resolved in her favor, Continental would still be entitled to judgment as a matter of law based on the 15–day exclusionary clause.

Moreover, her claims of fraud cannot withstand Continental's motion to dismiss. There is undisputed evidence that no post-claim underwriting occurred with respect to her application. In addition, the record is devoid of any evidence that supports her claim that Stoddard misrepresented the scope of her coverage to her. Since plaintiff

---

**18.** At his deposition, when asked to describe the 15–day exclusionary period, Stoddard stated that:

> injuries are covered immediately on the policy effective date, whatever that date is, and then it would be 15 days before you would have cov-

erage for anything in the way of sickness at all. Anything that manifested itself during the 15–day period, meaning came up with a sickness, or was hospitalized, or whatever it was, that condition is not covered, period.

has not, and cannot, plead any facts in support of this claim, Continental's motion to dismiss should be granted.

**THEREFORE**, it is

**ORDERED** that Defendant's Motion for Summary Judgment, with respect to the all of the claims of plaintiffs White and Davis be, and the same hereby are, **DENIED** in accordance with the reasons stated in this Order. It is further

**ORDERED** that Defendant's Motion for Summary Judgment, with respect to the contract claims of plaintiff Lamberson be, and the same hereby is, **GRANTED** in accordance with the reasons stated in this Order. It is further

**ORDERED** that Defendant's Motion to Dismiss Plaintiff Lamberson's Fraud Claim be, and the same hereby is, **GRANTED** in accordance with the reasons stated in this Order.