INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, an Illinois corporation, Plaintiff,

v.

UNIVERSITY OF WYOMING RE-SEARCH CORPORATION, a Wyoming not-for-profit corporation; Wyoming Coal Refining Systems, Inc., a Wyoming corporation; and Char Fuels Associates, Ltd., a Wyoming limited partnership, Defendants.

No. 92–CV–0310–B.

United States District Court, D. Wyoming.

April 25, 1994.

Peter G. Thompson, John R. Gerstein, Kevin M. LaCroix, Ross, Dixon & Masback (Law Offices), Washington, DC, John B. "Jack" Speight, Hathaway, Speight, Kunz & Trautwein, Cheyenne, WY, for plaintiff.

Raymond B. Hunkins, Wheatland, WY, John E. Stanfield, Bruce B. Waters, Smith, Stanfield & Scott, Laramie, WY, for defendants.

*ORDER DENYING DEFENDANTS' MO-TIONS FOR PARTIAL SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S CROSS-MOTIONS FOR SUMMARY JUDGMENT*

BRIMMER, District Judge.

The above-entitled matter having come before the Court on the Defendants' Motions for Partial Summary Judgment, and the Plaintiff's Oppositions thereto; and the Plaintiff's Cross–Motions for Summary Judgment, and the Defendants' Oppositions thereto; and the Court, having reviewed the materials on file herein both in support of and in opposition to, having heard oral argument, and being fully advised in the premises, hereby FINDS and ORDERS as follows:

### Factual Background

This is a declaratory judgment action in regards to the terms of a comprehensive liability insurance policy issued by the plaintiff-insurer, International Surplus Lines Insurance Company ("ISLIC") to the defendant-insured University of Wyoming Research Corporation, d/b/a Wyoming Research Institute ("WRI").

WRI, along with defendant Wyoming Coal Refining Systems, Inc. ("WCRS"), filed motions for partial summary judgment seeking declarations that the liability policy at issue in this case was valid and in force at all relevant times; that the underlying claims for which coverage is sought were covered by that policy; and that ISLIC received timely notice of the underlying claims.[1] ISLIC opposed these motions and, in addition, filed cross-motions for partial summary judgment on the issue of coverage and on the defendants' claims of bad faith. The defendants opposed these motions and the plaintiff filed reply briefs on these issues. All of these motions for summary judgment are presently before this Court.

**1.** ISLIC later conceded that it was not disputing the notice issue.

**2.** In overly simplified terms, CFA's process was based on its theory that a hot gas reactor could be used to turn coal into liquid fuel.

### A. The Agreement Between CFA and WRI

The facts leading up to this suit are somewhat complex, but generally are not disputed. On June 15, 1988, Char Fuels Associates, Ltd. ("CFA"), the predecessor corporation to WCRS, entered into a technical services agreement with WRI (the "agreement"). The terms of the agreement required WRI to perform testing of a process for coal liquification developed by CFA.[2] Almost immediately after WRI began the testing, however, CFA disputed whether WRI was properly performing its contractual obligations under the agreement. WRI claimed that it was having problems perfecting the reactor heating process phase of the testing, which, in addition to creating additional delay, ultimately required CFA to invest additional funds in the process.

In June 1991, WRI claimed that it had substantially completed the testing required by the agreement, and concluded that the liquification process did not work as CFA claimed. As noted above, CFA was not convinced that WRI properly performed contractual obligations, and moreover, the parties had disputes regarding CFA's refusal to pay certain invoices.

In the same month, WRI began negotiating with WCRS[3] regarding the possibility of an out-of-court settlement of the latter's potential claims against WRI for its alleged improper performance of its obligations under the agreement. WCRS wanted monies that it had paid to WRI returned along with an audit of WRI's records. On August 29, 1991, WCRS issued a stop-work order to WRI under the agreement. The next day, August 30, 1991, WRI submitted an application for a "Non–Profit Organization Liability Insurance Policy" to ISLIC.

### B. The Application and the Policy

Two specific questions contained in the application are of particular importance to this case. Question 15 asked:

**3.** For purposes of simplicity, the Court will refer to CFA by the name of its successor, WCRS, for the remainder of this order.

Has any claim been made, or is any now pending, against the organization, or any person proposed for insurance in the capacity of either Director, Trustee, Officer, or Employee? (If yes, give details).

This question was designed to elicit an answer in regards to both past and present claims against the applicant. In response to this question, WRI disclosed an existing claim that had been asserted against it by Southville Corporation. Question 17 then stated:

No person proposed for insurance is cognizant of any fact, circumstance or situation which said person has reason to suppose might afford valid grounds for any future claim against said person and/or the organization. (If answer is none, state that).

This question, which was related to question 15, was designed to elicit whether the applicant possessed knowledge of any "fact, circumstance or situation" relative to the possibility of any future claims against it. WRI answered this question "None." Immediately after question 17, the application declares that the applicant "agree[s] that if such facts, circumstances or situations exist any claim or action arising therefrom is excluded from the proposed coverage."

Based on WRI's answers to all of the questions in the application,[4] a policy was eventually issued by ISLIC to WRI, No. 524–144849–4, effective as of August 30, 1991. Various provisions of the policy are at issue and will be discussed in greater detail.

Section I of the policy discussed the nature and extent of coverage. Subsection (A) provided:

[t]he Company will pay on behalf of the Insureds all Loss which the Insureds shall be legally obligated to pay for any civil claim or claims first made against them because of a Wrongful Act, provided that the claim is first made during the policy period and written notice of said claim is

received by the Company during the policy period.

Section III is the definitional section, and it defined the salient terms used in section I as follows. The term "Insured" in subsection (A) included WRI itself as well as any director, officer, trustee, employee, volunteer or staff member, as well as any executive, board member and committee member. Subsection (D) defined the words "Wrongful Act" as "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty by one or more of the individual Insureds while acting in their capacity as an authorized representative of the Entity." Finally, subsection (E) defined the term "Loss" as "any amount which the Insureds are legally obligated to pay ... for Wrongful Acts ..."

Section VIII contained what is generally known as a "notice of potential claims" provision, which provided that under certain circumstances, short of the filing of an actual civil claim, the insured was required to give "written notice" to the insurer "as soon as practicable." The policy provided:

[i]f during the policy period ...

(a) The Entity or any Insureds shall receive written or oral notice from any party that it is the intention of such party to hold one or more Insureds responsible for the results of any specified Wrongful Act done or alleged to have been done by the Insureds while acting in the capacity aforementioned; or

(b) The Entity or any one of the individual Insureds shall become aware of any occurrence which may subsequently give rise to a claim being made against an Insured in respect of any such alleged Wrongful Act.

■ Section IX provided "[i]n the event of a claim, the Insureds shall take reasonable measures to protect their interests. If defense of a suit shall be required then the

---

4. ISLIC asserts that it acted "in reliance on" the representations made by UWRC in issuing this policy. This contention is reinforced by section V of the policy, which provides that "the statements contained in the written proposal form ... are reaffirmed as of the inception date of this Policy ... and are considered as incorporated

and constituting part of this Policy[,]" subsection 1.

Moreover, subsection 3 expressly states that "[i]n issuing this policy, the company has relied on the declarations and statements which are contained in the proposal form ... and which are deemed to be incorporated in this policy ..."

Insured shall appoint counsel." This section makes it apparent that this policy did not impose on the insurer a so-called "duty to defend." [5]

Section IV contains various exclusions from coverage, including, *inter alia*, claims "[b]rought about or contributed to by the dishonesty of the Insureds," subsection 3; and "[c]laims, demands or actions seeking relief, or redress, in any form other than money damages[,]" subsection 4(a).

Finally, section X provides that no action shall lie against the insurer unless, "as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, and until the amount of the Insureds' obligation to pay shall have been finally determined ... "

### C. *State Court Litigation Between WCRS and WRI*

The negotiations between WRI and WCRS did not resolve the parties' differences, and as a result, WCRS filed a complaint against WRI in the District Court for the Second Judicial District, County of Albany, State of Wyoming on December 19, 1991, almost three months after the policy took effect. The complaint sought solely equitable relief, primarily in the form of an audit in light of the disputes regarding the payment of outstanding invoices, and did not contain a claim for money damages.

Over the next seven months, WRI never specifically advised ISLIC of the initiation of this suit. Sometime in the middle of the summer of 1992, WRI received a preliminary audit report from its auditor who advised WRI to contact its insurance carrier. It was not until July 30, 1992, when WRI filed a request asking ISLIC to defend it in this suit, that ISLIC claims it first received notice of this litigation.

On August 12, 1992, ISLIC orally advised WRI that the policy only created a duty of indemnification and that it did not contain a duty to defend provision. Furthermore, ISLIC advised WRI that the policy affirmatively required WRI to retain counsel and prepare its own defense, which was subject to indemnification by ISLIC in accordance with the policy.

Five days later, ISLIC advised WRI of another basis for denying coverage: the specific exclusion under the policy for claims seeking solely equitable relief. This denial of coverage was subsequently memorialized in a letter dated September 2, 1992. WRI protested ISLIC's denial of coverage on the grounds that solely equitable relief was sought. This was due, in part, to the fact that counsel for WCRS had forwarded a status report to Judge Arthur Hanscum, who presided over the state court litigation, as well as to counsel for WRI, indicating that WCRS intended to amend its complaint to assert causes of action for negligence and for money damages. The complaint was eventually amended on October 27, 1992 to include claims for monetary relief.

ISLIC agreed to conduct further investigation into the nature of the state court litigation. Over the next several weeks, ISLIC contends that it demanded documentation from WRI relating to the state court litigation, but that those demands were not met. As a result, ISLIC simply reaffirmed its earlier denial of coverage. Eventually, ISLIC received a copy of the amended complaint, which asserted claims for negligence and which sought approximately $35 million in damages.

At this time, WRI again demanded that ISLIC defend it and ISLIC again refused, relying on the express terms of the policy. On November 20, 1992, ISLIC confirmed its denial of coverage for the litigation brought

**5.** In contrast to an indemnification clause, some insurance policies contain a provision known as a "duty to defend," whereby the insurer agrees to "defend an insured against any suit ... resulting from an occurrence that is within the scope of the insurance coverage." Robert E. Keeton and Alan I. Widiss, *Insurance Law* § 9.1(b) at 989 (1988). Wyoming adheres to the general rule that a duty to defend clause is broader than

a duty to indemnify. *See Aetna Life Ins. Co. v. Lythgoe*, 618 P.2d 1057, 1061 (Wyo.1980) (citations omitted). Because the insurer's duty to defend arises when there is the possibility of a claim against the insured, that duty will require the insurer to defend an action which might not ultimately result in an obligation to indemnify. *Id.* at 1061–62.

by WCRS on the grounds that WRI had not truthfully answered question 17 of the application for coverage. ISLIC specifically contended that WRI failed to disclose its then-existing situation with WCRS in the application for coverage, claiming that this knowledge constituted any "fact, circumstance or situation which said person has reason to suppose might afford valid grounds for any future claim against said person and/or the organization."

WRI again protested ISLIC's denial of coverage and ISLIC again agreed to conduct further investigation. ISLIC asserts that WRI again failed to cooperate and to produce the documents sought by ISLIC. This eventually led to ISLIC reaffirming its denial of coverage and further asserting on December 1, 1992, WRI's failure to cooperate as yet another defense to coverage.

From December 15th to December 17th of 1992, WCRS and WRI had their claims arbitrated by Judge Ranck. Following the arbitration, WRI again demanded that ISLIC defend it and further, that it agree that coverage was in fact unlimited. After ISLIC again refused, WRI allegedly threatened that unless ISLIC agreed to defend it against WCRS and further, that the policy was unlimited, WRI would abandon its defense of the state court litigation and that it would withdraw from that case and permit the trial court to enter a default judgment against it. These threats prompted ISLIC to file the present action for declaratory relief on December 31, 1992 in an effort to obtain a judicial determination of the respective rights and obligations of the parties under this policy.

On April 1, 1993, WCRS made ISLIC an offer to settle all of its claims against WRI for the sum of $999,950.00, an amount within WRI's $1 million policy limits. In a letter dated April 12, 1993, WCRS offered to extend ISLIC's period within which to accept this offer if it so desired. ISLIC requested an extension, and by another letter dated April 16, 1993, WCRS gave ISLIC until 5:00

p.m. on May 14, 1993, to accept this offer. ISLIC eventually declined the offer. On September 15, 1993, WCRS renewed its offer of $999,950.00 in settlement of the claims, which was to be accepted by 3:00 p.m. on September 24, 1993. Sometime on the 24th, counsel for WCRS again offered ISLIC an extension of time within which to accept the offer, but ISLIC simply allowed the offer to expire.

Then, on October 13, 1993, ISLIC alleges that it made an offer to fund WRI's defense in the state court suit pending resolution of the coverage issues in this case. WRI rejected this offer and on the same day, entered into a settlement agreement with WCRS.[6] The terms of that agreement provided, *inter alia*, that WRI would withdraw its answer to the original complaint in the state court action; that it would refuse to file an answer to the amended complaint; that it would not oppose the entry of a default judgment against it; and that it would assign to WCRS whatever rights it may have had against ISLIC. In exchange for this, WCRS agreed to give WRI what is commonly referred to as a "covenant not to execute," whereby WCRS agrees not to execute any judgment obtained against WRI and to look solely to ISLIC as a source of funds in satisfaction of any judgment entered against WRI in the state court litigation.

WRI complied with the terms and conditions of its settlement agreement with WCRS. In its October 15, 1993, motion to withdraw its answer, WRI affirmatively stated that it waived any potential objections it might have to the entry of a default judgment against it in those proceedings.

Then, on October 18, 1993, in an off-the-record, *ex parte* proceeding, Judge Hanscum entered a default judgment against WRI. While the actual entry of the default judgment might not have been very surprising, the amount of the default judgment is nothing short of stunning. Although the highest estimate of WCRS' damages in its suit against WRI was approximately $35 million,

---

**6.** WCRS alleges that it was forced to enter into settlement negotiations because of WRI's allegedly precarious financial condition and its corresponding inability to fund its own defense in the state court suit. WRI claims that settlement under these circumstances was the only reasonably prudent course of action.

Judge Hanscum awarded WCRS just under $750 million dollars.[7] On November 23, 1993, ISLIC learned that WRI and WCRS filed another suit in state court seeking to enforce this default judgment. ISLIC still maintains that its policy does not cover the claims by WCRS against WRI, and *a fortiori*, it cannot therefore be liable for the resulting judgment.

This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1) (1988), the diversity statute, and 28 U.S.C. § 2201 (1988), the declaratory judgment statute. In addition, any possible objections to this Court's exercise of personal jurisdiction over the defendants, and to venue in this forum, are deemed to have been waived pursuant to Rule 12(h)(1). Finally, the Court finds that there is an actual controversy between these parties such that this declaratory judgment action may be maintained consistent with Article III. *See generally Denhardt*, 836 F.Supp. at 799–800 (discussing the prerequisites to declaratory relief).

### Standard of Review

The standard for summary judgment is well-established and need not be recited in great detail here. *See Central Wyoming Law Assoc's, P.C. v. Denhardt*, 836 F.Supp. 793, 798 (D.Wyo.1993) (Brimmer, J.); *White v. Continental General Ins. Co.*, 831 F.Supp. 1545, 1551–52 (D.Wyo.1993) (Brimmer, J.). "By its very terms, [the Rule 56(c) ] standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original).

▪ The trial court decides which facts are material as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510; *see also Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir.1987). Summary judgment may be entered "against a party who fails to make a· sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Carey*, 812 F.2d at 623. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Carey*, 812 F.2d at 623. In considering a party's motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981).

### Discussion

The primary issue raised in these motions for summary judgment goes to the issue of whether the policy provides coverage for the claims by WCRS against WRI. ISLIC's complaint for declaratory relief, reinforced in its cross-motions for partial summary judgment, asserts several grounds in support of its position that there is no coverage in this case, all of which the defendants take issue with in their motions for partial summary judgment as well as their oppositions to plaintiff's motions.

### A. Applicable Law

This case was brought in federal court pursuant under 28 U.S.C. § 1332(a), the diversity of citizenship jurisdiction statute, to determine the contractual obligations and duties of parties to an insurance contract formed under the law of the state of Wyoming.

▪ It is a fundamental principle that "a federal court exercising diversity jurisdiction must apply the substantive law that a state

---

7. The judgment is short and conclusory and does not specify the basis for the entry of this astronomical award of damages. Nonetheless, it appears as though Judge Hanscum awarded WCRS the $35 million that it sought in compensatory damages, along with somewhere in the neighborhood of $715 million in punitive damages.

court sitting in that state would apply under its conflicts of law principles." *Daniels v. Kerr McGee Corp.,* 841 F.Supp. 1133 (D.Wyo. 1993) (Brimmer, J.) (discussing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The parties agree that Wyoming's substantive contract law governs the insurance contract at issue in this case, since the contract was made in Wyoming; was issued to a Wyoming policy holder; and was to be performed in Wyoming. *See, e.g., Wyoming Farm Bureau Mut. Ins. Co. v. State Farm Mut. Auto Ins. Co.,* 467 F.2d 990, 992 (10th Cir.1972) (interpreting Wyoming law). As a result, this Court is bound by the decisions of the Wyoming Supreme Court and its canons of interpretation and principles regarding the construction of contracts.

### B. General Principles of Contract Interpretation under Wyoming Law

■ The parties agree as to the basic principles of contract interpretation enunciated by the Wyoming Supreme Court. Initially, it is undisputed that an insurance policy is nothing more than a contract between the insurer and the insured. *See Worthington v. State,* 598 P.2d 796, 806 (Wyo.1979), *cited in State Farm and Cas. Co. v. Paulson,* 756 P.2d 764, 766 (Wyo.1988); *see also State Farm Mutual Automobile Ins. Co. v. Farmer's Ins. Group,* 569 P.2d 1260, 1262 (Wyo. 1977). As a result, general principles of contract interpretation apply with equal force to the interpretation of insurance policies. *See Hocker v. New Hampshire Ins. Co.,* 922 F.2d 1476, 1480 (10th Cir.1991) (interpreting Wyoming law). Insurance policies, therefore, "must be enforced like other contracts according to terms which have been used therein by the parties." *Addison v. Aetna Life Ins. Co.,* 358 P.2d 948, 950 (Wyo.1961).

■ A court's function in interpreting a contract is limited to ascertaining, and giving effect to, the intentions and mutual understandings of the contracting parties. *See, e.g., Jackson Hole Racquet Club Resort v. Teton Pines Ltd. Partnership,* 839 P.2d 951, 958 (Wyo.1992) (citing *True Oil Co. v. Sinclair,* 771 P.2d 781, 790 (Wyo.1989)); *Jackson*

*State Bank v. Homar,* 837 P.2d 1081, 1089 (Wyo.1992) (citations omitted); *Wyoming Bd. of Certified Public Accountants v. Christensen,* 800 P.2d 853, 856 (Wyo.1990); *State v. Pennzoil Co.,* 752 P.2d 975, 978 (Wyo. 1988); *Amoco Prod. Co. v. Stauffer Chem. Co. of Wyoming,* 612 P.2d 463, 465 (Wyo. 1980) (citing *Fuchs v. Goe,* 62 Wyo. 134, 163 P.2d 783, 791 (1945)); *Natrona Power Co. v. Clark,* 31 Wyo. 284, 225 P. 586, 588 (1924).

■ In attempting to ascertain the parties' intentions, the Court must construe the contract *in toto. See, e.g., Lund v. Lund,* 849 P.2d 731, 739 (Wyo.1993) (citing *Bethurem v. Hammett,* 736 P.2d 1128, 1136 (Wyo.1987)); *Hensley v. Williams,* 726 P.2d 90, 94 (Wyo. 1986); *Kost v. First Nat'l Bank of Greybull,* 684 P.2d 819, 823 (Wyo.1984); *Quin Blair Enters. v. Julien Const. Co.,* 597 P.2d 945, 951 (Wyo.1979); *Shepard v. Top Hat Land & Cattle Co.,* 560 P.2d 730, 732 (Wyo.1977).

■ Nonetheless, when the contracting parties have reduced their contract to a written document, a court "look[s] no further than the four corners of the contract to determine the intent of the parties." *Holst v. Guynn,* 696 P.2d 632, 634 (Wyo.1985) (citations omitted); *accord Nelson v. Nelson,* 740 P.2d 939, 940 (Wyo.1987); *accord Lund,* 849 P.2d at 739; *Klutznick v. Thulin,* 814 P.2d 1267, 1270 (Wyo.1991); *Kerper v. Kerper,* 780 P.2d 923, 934 (Wyo.1989) (citing *Paulson,* 756 P.2d at 766; *Wangler v. Federer,* 714 P.2d 1209, 1217 (Wyo.1986)); *Amoco,* 612 P.2d at 465 (citing *Wyoming Bank and Trust Co. v. Waugh,* 606 P.2d 725, 730 (Wyo.1980); *Hollabaugh v. Kolbet,* 604 P.2d 1359, 1361 (Wyo. 1980); *Pilcher v. Hamm,* 351 P.2d 1041, 1043 (Wyo.1960)).

■ If the terms of a contract are ambiguous, which is a question of law for the court to decide, *see, e.g., Continental Ins. Co. v. Page Eng'g Co.,* 783 P.2d 641, 651 (Wyo. 1989); *Nelson,* 740 P.2d at 940 (citing *Wangler,* 714 P.2d at 1217; *Hensley,* 726 P.2d at 94; *State v. Moncrief,* 720 P.2d 470, 473 (Wyo.1986)), then, and only then, may the Court look to extrinsic, or so-called "parol" evidence in order to assist it in the determination of the true intentions of the parties. *See, e.g., Jackson Hole Racquet Club,* 839

P.2d at 959 (citing *Worland Sch. Dist. v. Bowman*, 445 P.2d 364, 366 (Wyo.1968)); *Cliff & Co., Ltd. v. Anderson*, 777 P.2d 595, (Wyo.1989); *Amoco*, 612 P.2d at 465 (citing *Kilbourne–Park Corp. v. Buckingham*, 404 P.2d 244, 245–46 (1965)). This Court may not, however, "rewrite a clear and unambiguous contract under the guise of interpretation." *Klutznick*, 814 P.2d at 1270 (citation omitted); *accord St. Paul Fire and Marine Ins. Co. v. Albany County Sch. Dist. No. 1*, 763 P.2d 1255, 1258 (Wyo.1988). Furthermore, "[t]he intent of the parties can only be ascertained by an objective not subjective approach ..." *Shrum v. Zeltwanger*, 559 P.2d 1384, 1387 (Wyo.1977); *accord Hayes v. American Nat'l Bank of Powell*, 784 P.2d 599, 604 (Wyo.1989).

▮ If the Court concludes that the contract is in fact unambiguous and that its terms are clear, then "the disposition of disputes relating to such a contract properly may be accomplished by a summary judgment." *Continental Ins. Co.*, 783 P.2d at 651 (citing *Pennzoil Co.*, 752 P.2d at 978 (Wyo. 1988)); *Hayes*, 784 P.2d at 604 (noting that there are no issues of fact present when the language of the contract is clear and unambiguous) (citing, *inter alia, Hillman v. Raymond*, 733 P.2d 605, 607 (Wyo.1987)).[8]

▮ If, however, the terms of the contract are ambiguous, then it is well-established that because insurance contracts are contracts of adhesion, any ambiguity must be construed strictly against the drafter-insurer and liberally in favor of the insured. *See, e.g., Aetna Ins. Co. v. Lythgoe*, 618 P.2d 1057, 1060 (Wyo.1980); *Wilson v. Hawkeye Cas. Co.*, 67 Wyo. 141, 215 P.2d 867, 874–75 (1950). A contract is ambiguous only if it "is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." *Bulis v. Wells*, 565 P.2d 487, 490 (Wyo.1977), *quoted in Amoco*, 612 P.2d at 465; *see also Paulson*, 756 P.2d at 766 n. 1 (citing Wyoming cases). It is important to

understand, however, that an "[a]mbiguity justifying extraneous evidence is not generated by the subsequent disagreement of the parties concerning [the contract's] meaning." *Paulson*, 756 P.2d at 766 (quoting *Amoco*, 612 P.2d at 465 (citing *Homestake–Sapin Partners v. United States*, 375 F.2d 507, 511 (10th Cir.1967) (citations omitted))).

▮ In deciding whether a contract is ambiguous *vel non*, the "words and acts of the parties must be given effect in accordance with the meaning which they would convey to *reasonable men* at the time and place of their use or commission." *Klutznick*, 814 P.2d at 1270 (citing *Wangler*, 714 P.2d at 1213) (emphasis added). "An objective test is applied. A party's intention will be held to be what a *reasonable man* in the position of the other party would conclude his manifestations to mean." *Shrum*, 559 P.2d at 1387 (citation omitted) (emphasis added).

As the Wyoming Supreme Court stated in *Worthington:*

> [w]here there are any ambiguities or uncertainties in the meaning of the language used in a policy, they must be strictly construed against the insurer who drafted the contract. *Wilson v. Hawkeye Casualty Co.*, 67 Wyo. 141, 215 P.2d 867, 874–75 (1950). However, if the language is clear and unambiguous, there is no room for the court to resort to a strict construction against the insurer, and the insurance policy must be interpreted *according to the ordinary and the usual meaning of its terms.* *McKay v. Equitable Assurance Society of the United States*, [421 P.2d 166, 168 (Wyo.1966).]

*Worthington*, 598 P.2d at 806 (citations omitted) (emphasis added), *quoted in Paulson*, 756 P.2d at 765. In sum, the "language of the policy is to be construed in accordance with the principle that the test is not what the insurer intended its words to mean but what a *reasonable person in the position of*

---

8. Of course, while these cases stand for the proposition that issues involving an unambiguous contract are amenable to summary judgment, the *standard* for determining whether a party is entitled to summary judgment is a procedural matter and therefore this Court is bound by federal law interpreting Rule 56(c) of the Federal Rules of Civil Procedure, and not Wyoming law regarding the standards for summary judgment. *E.g., Bowman v. United States*, 821 F.Supp. 1442, 1444 (D.Wyo.1993) (Johnson, C.J.) (noting that interpretation of an unambiguous contract is a question of law that is amenable to summary judgment under the standards of Rule 56(c)).

*the insured would have understood them to mean." Wilson,* 215 P.2d at 873–74 (citing *Merchants Mut. Cas. Co. v. Lambert,* 90 N.H. 507, 11 A.2d 361, 362 (1940) (emphasis added)). Finally, the repeated emphasis on what a "reasonable" person would understand the terms to mean makes it readily apparent that the inquiry is necessarily an objective one and is not dependent· on one parties' subjective interpretation of the words of the contract.

## C. *Misrepresentation*

As noted above, the defendants filed a motion for partial summary judgment seeking three declaratory judgments: (1) that the policy at issue was valid and in force at all times relevant to this litigation; (2) that the claims asserted by WCRS against WRI were in fact covered by the policy; and (3) that ISLIC received timely notice of the claims asserted by WCRS against WRI in accordance with the terms of the policy, a claim that is not contested by ISLIC. The plaintiff opposed these motions and then filed three separate cross-motions for summary judgment on the issues of coverage and bad faith. The defendants opposed these motions and the plaintiff subsequently filed replies to these oppositions.

ISLIC asserts two grounds in support of its position that it is entitled to a declaratory judgment that there is no coverage. First, it contends that WRI's answer to question 17 of the application for coverage constituted a misrepresentation and a failure to disclose pertinent information which precludes coverage under the express terms of the application. ISLIC asserts that the question was not ambiguous and that WRI's interpretation

of question 17 was unreasonable as a matter of law. Second, ISLIC contends that even if coverage is not barred by its allegation of misrepresentation, the claims for which coverage is sought are still not covered under the various exclusionary provisions contained in the policy. The Court will address these claims *seriatim.*

### 1. *Question 17*

Question 17 of the application for coverage was designed to elicit whether the applicant was "cognizant of any fact, circumstance or situation" that "might afford valid grounds for any future claim" against the applicant. WRI answered this question "None." ISLIC contends that WRI's interpretation is unreasonable as a matter of law and, as a result, claims that it is entitled to summary judgment because this misrepresentation excludes coverage under the express terms of the application, which have been incorporated into the policy itself pursuant to section V(3) of the policy.

The defendants' motion for partial summary judgment takes the opposite position: that the phrases "ha[ve] reason to suppose" and "valid grounds for a future claim" used in question 17 [9] are susceptible to different interpretations and that when viewed in the insured's favor, those phrases are ambiguous such that WRI's response "none" was not unreasonable.

This Court is not persuaded by the defendants' arguments and concludes that question 17 was clear and unambiguous and further, that WRI's response was unreasonable as a matter of law. Therefore, any potential coverage is excluded under the terms of the application itself.[10]

**9.** Of course, when UWRC filled out the application for coverage, which contained question 17, there was no "contract" of insurance then existing. Nonetheless, because the policy was in fact issued and because Section V of the policy expressly adopts the representations contained in the application as part of the policy, the Court believes that the canons of contract interpretation discussed above are fully applicable to the interpretation of question 17.

**10.** The Court's holding on this point is that there is no coverage under the terms of the policy, and not that the plaintiff could validly rescind coverage. The plaintiff has not asserted a claim for

rescission of the policy based on a "misrepresentation" that it alleges was "material to the risk." *See* WYO. STAT § 26–15–109(a) (1991). If such a claim was made, it is arguable whether summary judgment would be appropriate.

In *White,* 831 F.Supp. at 1552–54, this Court held that the issue of whether an alleged misrepresentation was in fact "material to the risk" was "usually a question of fact for the jury to decide[.]" *Id.* at 1554. Nonetheless, this Court did state that summary judgment might be appropriate if "the misrepresentation 'is of such a nature that there can be no dispute as to its materiality.' " *Id.* (citing *Bageanis v. American Bankers Life Ins. Co. of Florida,* 783 F.Supp. 1141, 1145

■ The threshold question for the Court to determine is whether the language of question 17, and the subsequent disclaimer of coverage if the answer to the question is later found to be incorrect, read in light of the contract as a whole, are ambiguous. The mere fact that this language is part of an exclusionary clause does not make it *per se* ambiguous; rather, the Court must look to the language itself and determine whether there is an ambiguity when the contract is read *in toto* by an objective[11] person in WRI's position. For reasons given below, this Court finds that the language is not ambiguous.

The plaintiff's argument is that WRI knew of information in regards to its negotiations with CFA and WCRS that should have been disclosed in response to question 17 since that knowledge allegedly fell within the purview of that question as interpreted by a reasonable person in WRI's position.

■ The ultimate inquiry can be phrased as follows: would a reasonable "person" in the position of WRI have been cognizant of any "fact, circumstance or situation" which gave WRI "reason to suppose might afford valid grounds for any future claim" against it under an objective definition of those terms. In responding to this point, the defendants' argue that:

> '[h]as reason to suppose,' would reasonably be expected to mean that some claim has already been threatened and that the person seeking insurance has come to a conclusion about the likelihood of the claim actually being asserted in the future. 'Valid grounds for a future claim,' as read by an ordinary business person, means that the *merits* of a threatened claim have been

evaluated and the applicant has concluded that it may have some exposure to liability[.]

This argument is not persuasive. It rests on the defendants' subjective interpretation of those phrases, interpretations which this Court finds to be objectively unreasonable as a matter of law. It is simply untenable to think, in light of the nature and extent of the disputes between WRI and CFA and WCRS over the former's alleged improper performance of the technical services agreement and the discussions between the parties prior to WRI's decision to apply for coverage, that an objective "person" such as WRI would not find reason to suppose that its situation with CFA "might" afford valid grounds for a future claim against WRI.

### a. *"Has Reason to Suppose"*

■ WRI's interpretation of the "has reason to suppose" language, quoted above, is exactly that: its own subjective understanding. Moreover, the word "suppose," given its ordinary and normal meaning, simply belies the defendants' statement that the phrase refers to a claim that has already been threatened and that will likely manifest itself in the future. Webster's defines the term "suppose" as "anticipate," or "to accept tentatively as true," or "to think probable or in keeping with the facts." *See* Webster's Third New International Dictionary 2298 (1971). As such, question 17 does not require that the person know that a claim has already been threatened, but only whether such a claim could reasonably be anticipated in the future—as a matter of probabilities[12]—and in keeping with the facts known to exist at that time.

---

(N.D.Ill.1992)). As noted, however, the plaintiff is not seeking rescission of the policy, and as a result, the Court intimates no opinion on whether summary judgment would be warranted on a claim for rescission.

**11.** The use of the words "reason to suppose" clearly mandates an objective inquiry. *See International Ins. Co. v. Peabody Intern. Corp.*, 747 F.Supp. 477, 483 (N.D.Ill.1990) (finding that "reason to suppose" language in an insurance policy "plainly establishes a reasonableness standard as in a reasonable person.") (discussing *Evanston Ins. Co. v. Security Assurance Co.*, 715 F.Supp. 1405, 1414 (N.D.Ill.1989)).

**12.** The *Evanston* court, in interpreting a similar provision to the one at issue in this case, stated that the language "calls for no judgmental or subjective evaluation, but in traditional objective language requires the disclosure of any facts *indicating the probability* of a covered claim." *Evanston*, 715 F.Supp. at 1414 (emphasis added), *quoted with approval in Peabody*, 747 F.Supp. at 483.

This objective interpretation is entirely consistent with this Court's interpretation of the word "suppose" as raising an issue of probabilities, and not a requirement that a claim already have been threatened.

In addition, the words "ha[ve] reason" also belie UWCR's interpretation. Once again, the applicant need not have made a decision as to whether a claim has already been threatened, but must simply have reason to think *that such a claim might occur.* The Court is therefore not persuaded by the defendants' interpretation of the phrase "has reason to suppose."

b. *"Valid Grounds for a Future Claim"*

■ As far as the interpretation of the phrase "valid grounds for a future claim," the defendants argue that any potential claims asserted in this case were not "valid." The Court is not persuaded by this argument for two reasons. First, the term "valid" does not directly modify the claim itself; rather, it asks whether the knowledge possessed by the applicant "might afford" it with a reasonable basis for believing that a third party claimant would have valid *grounds* for a future claim, and not whether the claim itself was necessarily valid.

Second, the defendants' argument overlooks the words *"might* afford" that modify this phrase. "Might" is defined by Webster's as "less probability or possibility than may." Webster's Third New International Dictionary at 1432. "May," in turn, is defined as being "in some degree likely to." *Id.* at 1396. Therefore, it follows syllogistically that the phrase "might afford valid grounds" means something less than a "likelihood." Thus, the issue is whether a reasonable business person in the position of WRI would have believed that it had knowledge of facts or circumstances that "might afford valid grounds" for a future claim against it.

Clearly, WRI knew that any potential claims between it and CFA were related to its alleged improper performance of the technical services agreement. Under the natural and ordinary meaning of the terms "might afford" and "valid grounds," it is clear that a reasonable "person" in WRI's position could not reasonably conclude that the circumstances surrounding the difficulties and negotiations with CFA and WCRS would not

possibly afford valid grounds for a future claim against WRI.

Moreover, the Court finds further support in the *Evanston* case, which was relied on by the plaintiff. In *Evanston,* the Court interpreted a provision similar to the one in this case,[13] and rejected a similar argument, concluding that the application's reference to a "valid" claim:

> might be read to suggest the potential claim would have to be a prospective *winner* before [the applicant] could be left naked by its failure to disclose the matter in the Application. But even if that were so, that would still not make [the applicant's] *subjective* judgment on that score the test for whether disclosure is required. Once again, [the application] asks whether the insured has 'reason to suppose,' and under that language no insured could hide behind an unreasonable ostrichlike failure to recognize an incipient claim.

*Evanston,* 715 F.Supp. at 1414 n. 15 (emphases in original). Thus, the applicant's subjective assessment as to the validity *vel non* of any potential claim is not controlling; as has been stated *ad nauseam,* the question is the objective reasonableness of the applicant's interpretation. For all of the foregoing reasons, the Court finds that the defendants' interpretation is unreasonable as a matter of law. *See Peabody,* 747 F.Supp. at 483.

In sum, therefore, the Court believes that WRI did in fact possess knowledge of facts, circumstances or situations that would give it "reason to suppose might afford valid grounds for any future claim" against it. Because the application specifically disclaimed coverage if such information was known, but was not disclosed, the Court finds that the "misrepresentation" contained in the answer to question 17 precludes coverage in this case under the language of the policy.

*2. The Exclusionary Provisions of the Policy*

Even if coverage was not excluded by virtue of WRI's answer to question 17, it is

---

**13.** The provision at issue in *Evanston* provided: No person(s) or entity(ies) proposed for this insurance is (arc) cognizable of any act, error, or omission which hc (they) has (havc) reason to suppose might afford valid grounds for any future claim(s) such as would fall within the scope of the proposed insurance, except as follows: (If answer is NONE, so state.)

clear that at least one of the exclusionary provisions of section IV of the policy would support a finding of no coverage. Section IV(3) of the policy expressly provides:

> [t]he Company shall not be liable to make payment for Loss in connection with any claim made against the Insureds allegedly, based upon or arising out of any one or more of the following:
>
> . . . .
>
> 3. *Brought about or contributed to by the dishonesty of the Insureds,* however, notwithstanding the foregoing, the Insureds shall be protected under the terms of this policy as to any claims upon which suit is brought against them by reason of any alleged dishonesty on the part of the Insureds, unless a *judgment or other final adjudication thereof adverse to the Insureds* shall establish that the acts of active and deliberate dishonesty committed by the Insureds with actual *dishonest purpose and intent were material to the cause of action* so adjudicated.

The plaintiff argues that this so-called "dishonesty exception" to coverage is fully applicable in this case and that it precludes coverage. The plaintiff argues that the fourteenth cause of action asserted by WCRS against WRI in the amended complaint in the state court action contained a claim for "fraud in the inducement," and that WRI's withdrawal of its appearance in that matter culminated in a "judgment or other final adjudication thereof adverse to the Insureds" in the form of a default judgment. As a result, it argues that the three essential components of this exclusion—a claim involving dishonesty, a judgment or other final adjudication on that claim, and a showing that

actual intent was a necessary element of that claim—have been shown, and therefore, any potential coverage is excluded. Although the defendants take issue with all three of these components, the Court is not persuaded by these arguments and finds that this exclusion does in fact apply and preclude coverage in this case.

### a. *Dishonesty*

The first prong of this exclusion requires a showing that the resulting loss was "[b]rought about or contributed to by the dishonesty of the Insureds." [14] In this vein, the plaintiffs argue that the amended state court complaint alleged a cause of action for fraud in the inducement and that this is *ipso facto* a claim involving dishonesty. The defendants cursorily argue that the cases cited by the plaintiff are distinguishable because they involved situations where criminal conduct, such as embezzlement, theft or misappropriation, was the dishonest act that excluded coverage under interpretations of similar provisions in other cases. This argument is without merit.

The Court does not believe that the term dishonesty is limited to the criminal context, thereby excluding a civil claim for fraud in the inducement. This is especially true since Webster's defines the term "dishonesty" as a "disposition to defraud, deceive or betray" or as a "deviation from probity." *Webster's Third New International Dictionary* at 650. Thus, while it may be entirely clear that the criminal acts involved in the cases cited by the plaintiff are *per se* dishonest acts, this in no way implies that a noncriminal act cannot be a dishonest act.

Fraud is a civil claim that epitomizes the essence of dishonesty. It is well-settled law

---

**14.** This Court will assume, without deciding, that the alleged loss in this case is in fact a loss that UWRC was "legally obligated to pay" under the definition of that term in section III(E) of the policy.

Resolution of this issue is not necessary to this Court's ruling, and in light of the fact that there does not appear to be any authoritative Wyoming precedent on the question of the effect of a covenant not to execute on a "legally obligated to pay" condition in an insurance policy, *compare Freeman v. Schmidt Real Estate & Ins. Inc.,* 755 F.2d 135 (8th Cir.1985) (affirming summary judgment for the insurer on the grounds that the

insured was not legally obligated to pay by virtue of a covenant not to execute) *with Greer v. Northwestern Nat'l Ins. Co.,* 109 Wash.2d 191, 743 P.2d 1244 (1987) (holding that a covenant not to execute has no effect on a legally obligated to pay condition), the Court will not reach out and decide this question of state law when the Wyoming Supreme Court has not spoken to the issue and especially where a decision by this Court is not essential to its disposition of the case. Therefore, the Court merely assumes, without deciding, that *Greer* is correct and that the insurer is not relieved of its obligation to pay because of a covenant not to execute.

that a prima facie claim for fraud requires proof of, *inter alia*, a false representation. *See, e.g., Duffy v. Brown*, 708 P.2d 433, 437 (Wyo.1985) (citations omitted). A false representation is, by definition, an act that "deviates from probity." Under these circumstances, the Court finds that the first component of this exclusion is satisfied by the fact that CFA asserted a claim against WRI for fraudulent inducement.

b. *Judgment or Other Final Adjudication*

■■■ The policy goes on to state that the mere fact that a third party claimant *alleges* a claim involving dishonesty does not automatically remove the claim from coverage; it is only if that claim results in the entry of a "judgment or other final adjudication" that is adverse to the insured that coverage would be excluded. In this case, the plaintiff argues that a default judgment is a "judgment" within the meaning of this exclusion. This Court agrees.

■■■ Professors Wright, Miller and Kane succinctly summarized the effect of a default judgment in their treatise, stating that a default judgment:

> is treated as a conclusive and final adjudication of the issues necessary to justify the relief awarded and is given the same effect as between the parties as a judgment rendered after a trial on the merits.

Charles A. Wright et al., 10 *Federal Practice and Procedure* § 2684 at 419–20 (1983) (footnote omitted). It is equally clear that because a default judgment operates as a judgment on the merits, it is entitled to claim preclusive effect. As the Supreme Court held in *Riehle v. Margolies*, 279 U.S. 218, 49 S.Ct. 310, 73 L.Ed. 669 (1929), "[a] judgment of a court having jurisdiction of the parties and of the subject matter operates as *res judicata*, in the absence of fraud or collusion, *even if obtained by default*." *Id.* at 225, 49

S.Ct. at 313 (citations omitted) (emphasis added); *see also* Charles A. Wright et al., 18 *Federal Practice and Procedure* § 4442 at 373–74 n. 1 (1981) (citing *Margolies* and other cases).[15] Moreover, a default judgment is in fact a final judgment for purposes of appealability under 28 U.S.C. § 1291(a) (1988). *See, e.g., Herzfeld v. Parker*, 100 F.R.D. 770, 773 (D.Colo.1984) (citations omitted).

For all of these reasons, it cannot reasonably be argued that a default judgment is not a "judgment or other final adjudication" under the ordinary legal definition given to that term. As noted above, a default judgment is both a final judgment and a judgment on the merits. Under these circumstances, the Court concludes that the second component of the dishonesty exclusion has been satisfied.

c. *Materiality of Intent to the Cause of Action*

■■■ The third and final component requires proof that the default judgment established that the dishonest acts discussed above required proof of actual dishonest purpose and intent as material elements of the cause of action—that intent is an element of the claim of fraud in the inducement. The defendants' primary argument is that even if the allegations in the amended state court complaint were resolved on the merits by virtue of the default judgment, those allegations do not support a finding of this portion of the dishonesty exclusion. Specifically, the defendants contend that the allegedly defaulted claims were only for *negligent* misrepresentation and thus lack the element of scienter necessary to constitute actual fraud. This argument is specious and must be rejected as an inaccurate misstatement of the amended state court complaint, which was drafted by WCRS itself. While it is certainly true that four of the counts in the amended

---

15. Of course, the doctrine of collateral estoppel, also known as issue preclusion, does not apply in the context of a default judgment because an essential element of that doctrine requires that the claim sought to be precluded have been "actually litigated" in the earlier litigation. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979) (citations omitted). Thus, although a default judgment is entitled to claim preclusive effect, it is not entitled to any issue preclusive effect because nothing was actually litigated. *See* Charles A. Wright et al., 18 *Federal Practice and Procedure* § 4442 at 375 (1981) (footnote omitted).

state court complaint involve causes of action based on negligence in one form or another,[16] the defendants' argument fails to acknowledge that count fourteen is clearly entitled "Fraud in the Inducement." Therefore, the defendant's negligent misrepresentation argument is irrelevant since a separate cause of action was claimed for fraud.

 There is a fundamental difference between a cause of action predicated on negligent misrepresentation and one predicated on intentional misrepresentation, also known as fraud. Obviously, the causes of action both share common attributes, namely, misrepresentations upon which another party relies to its detriment. They are distinct, however, in one critical respect: the element of intent. *Compare Duffy*, 708 P.2d at 437 (discussing the mental state required for negligent misrepresentation as proof that the defendant "failed to exercise reasonable care in obtaining or relating the information"), *quoted with approval in Husman, Inc. v. Triton Coal Co.*, 809 P.2d 796, 801 (Wyo. 1991) *with Matter of the Estate of Reed*, 566 P.2d 587, 590–91 (Wyo.1977) (discussing the fact that proof of fraud requires proof of "actual intent") *and Duffy*, 708 P.2d at 437 (indicating the proof of fraud requires proof that the false representations were "made to induce action" and not simply the product of the failure to exercise reasonable care, i.e., negligence).

In the present case, the issue whether any portion of the amended state court complaint, which WRI defaulted on, resulting in a judgment against it, contained a cause of action which involved a dishonest act which had as an essential element proof of actual intent. It is clear that count fourteen of the amended state court complaint, filed by defendant WCRS, meets this definition. That cause of action is replete with allegations such as WRI "knew its representations were false";

that WRI made "intentional omissions" and "intentional misrepresentations," and that UWRC acted with "deceit." It is patently obvious that this cause of action for fraud in the inducement requires, as an essential element, proof of actual intent. *See Lavoie v. Safecare Health Serv. Inc.*, 840 P.2d 239, 252 (Wyo.1992) (noting that fraud requires proof of actual intent). Moreover, as discussed above, this element was established by virtue of WRI's default judgment.

In sum, therefore, the plaintiff has established the three components of the dishonesty exclusion: that there was a claim involving dishonesty, that a judgment was entered on this claim, and that proof of intent was material to that cause of action. As a result, the policy exclusion for dishonesty provides another basis, in addition to the misrepresentation regarding question 17, by which the plaintiff is relieved from any potential obligation to provide coverage in this case.[17]

### B. The Bad Faith Claims

In addition to the issues regarding coverage, the plaintiff also seeks a declaratory judgment that its actions did not amount to "bad faith." The defendants have asserted two distinct claims for bad faith against the plaintiff. The first claim alleges that the plaintiff committed the tort of so-called "procedural first-party bad faith" in regards to its handling and investigative tactics relating to the defendants' claims for coverage. The second claim alleged involves the tort of so-called "third-party bad faith" which is predicated on the defendants' claims that the plaintiff failed to consider legitimate settlement offers made by WCRS regarding its claims against WRI. In order to fully understand the nature of these claims, it will be necessary to review existing law in Wyoming on the issues of bad faith.

16. Count one was entitled "Negligent Misstatements and Negligent Misleading Statements"; count three was entitled "Professional Negligence"; count four was entitled "Negligence"; and count five was entitled "Negligent Supervision."

17. The plaintiff has also alleged that several of the other specific policy exclusions apply in this case and justify a conclusion that no coverage is available in this case. The Court intimates no opinion on the merits of those arguments in this case because its conclusions set forth above are sufficient to resolve this case.

### 1. Substantive and Procedural First-Party Bad Faith [18]

#### a. Controlling Legal Standards

▮ In *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855 (Wyo.1990), the Wyoming Supreme Court recognized the tort of first-party bad faith. The Court noted that this independent cause of action in tort was grounded in the implied covenant of good faith and fair dealing which was imposed by law in, *inter alia,* contractual relationships between parties with unequal bargaining power. *See id.* at 857–58; *see also White,* 831 F.Supp. at 1555. In defining the elements of this cause of action, the Court made it clear that this tort was an intentional tort, requiring proof of two elements: (1) that the insurer acted with "knowledge or reckless disregard" for (2) whether it possessed a "fairly debatable" basis, measured objectively, for disputing the insured's claim. *McCullough,* 789 P.2d at 860 (citation omitted); *see also Darlow v. Farmers Ins. Exchange,* 822 P.2d 820, 823–24 (Wyo.1991); *White,* 831 F.Supp. at 1555 (Wyoming law). The "fairly debatable" prong of this claim was found to strike the proper balance between the insurer's ability to dispute a claim and the protection of the insured from arbitrary and baseless refusals to pay. The Court held that "if a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing." *McCullough,* 789 P.2d at 860 (citations omitted); *see also Oulds v. Principal Mut. Life Ins. Co.,* 6 F.3d 1431, 1436 (10th Cir.1993) (Oklahoma law). Proof of these two elements by the insured constitutes substantive first-party bad faith. The modifier "substantive" is used in recognition of the fact that this tort implicates the merits of the insured's claim for coverage against the insurer by focusing on whether the insur-

er possessed an objectively legitimate reason for disputing the insured's claim.

Approximately two and a half years after *McCullough,* the Wyoming Supreme Court decided *Hatch v. State Farm Fire and Cas. Co.,* 842 P.2d 1089 (Wyo.1992). *Hatch* considered the following question:

> [i]f the insurer demonstrates, as it has here, that denial of the claim is protected by the 'fairly debatable defense,' should [the insurer] nevertheless be subjected to liability *if its investigating, handling, and denying the claim violated the implied covenant of good faith and fair dealing.*

*Id.* at 1097 (emphasis added). Thus, *Hatch* presented the question of whether the investigatory procedures utilized by an insurer could amount to first-party bad faith, even if the insurer was entitled to debate the underlying merits of the insured's claim.

The state supreme court's decision in *Hatch* was based in part on the tort of intentional infliction of emotional distress, adopted in *Leithead v. American Colloid Co.,* 721 P.2d 1059 (Wyo.1986), as well as on the independent cause of action for bad faith based on the insurer's breach of the implied covenant of good faith and fair dealing. *See Hatch,* 842 P.2d at 1096–97.[19] The *Hatch* court ultimately concluded:

> [e]ven though the insurer here had a 'fairly debatable' reason for not paying the claim in the first place ... it cannot properly go beyond a reasonable denial of the claim and engage in unreasonable or unfair behavior to gain an unfair advantage. A 'fairly debatable' reason to deny a claim is not a defense against torts that may flow from engaging in oppressive and intimidating claim practices.

**18.** While the Wyoming Supreme Court has not adopted the labels "substantive" and "procedural" bad faith, the Court believes that the discussion below illustrates why these labels are useful in differentiating between these two distinct types of first-party bad faith.

**19.** The *Hatch* court noted the hybrid nature of its holding as follows:

> [w]e will consider these two torts together, realizing that other circumstances may very

well require the focus be on one tort or the other. In other words, the tort of intentional infliction of emotional distress and the tort of violation of a duty of good faith and fair dealing are separate torts, depending on the circumstances.

*Hatch,* 842 P.2d at 1097; *cf. White,* 831 F.Supp. at 1556 n. 13 (discussing *Hatch* and noting its similarity to the tort of intentional infliction of emotional distress).

*Id.* at 1099. *Hatch* thereby recognized the tort of "procedural" first-party bad faith.

■ Thus, while it is clear that substantive and procedural first-party bad faith claims are distinct causes of action, they are both first-party tort claims; that is, they are claims involving only two parties, the insurer and the insured.

### b. *Application in this Case*

The defendants have not asserted a claim against ISLIC for substantive first-party bad faith under *McCullough* and its progeny. They have, however, alleged that ISLIC's handling of their claims constituted procedural first-party bad faith under *Hatch.* For reasons given below, the Court finds no merit to this claim.

The defendants have alleged three circumstances which they contend constitute procedural first-party bad faith on the part of ISLIC: (1) the filing of a declaratory judgment action; (2) an alleged violation of the Service of Suit clause in the policy; and (3) allegations that plaintiff's counsel has engaged in malicious and outrageous litigation tactics in defending this action.

*Hatch* is the only precedent from the Wyoming Supreme Court on the question of procedural first-party bad faith. The Wyoming Supreme Court's ultimate holding, however, was simply that it was inappropriate for the trial court to grant summary judgment on the plaintiff's claim for relief given the nature of the claims asserted against the insurer.[20] While *Hatch* did not provide much guidance on what constitutes procedural first-party bad faith, this case does not present an issue that would test the outer limits of this cause of action. It is clear that the allegations in this case, whether viewed individually or together, do not, as a matter of law, rise to the level of either "extreme and outrageous" conduct or "oppressive and intimidating" claims practices.

**20.** One paragraph from the Wyoming Supreme Court's opinion in *Hatch* illustrates the rather egregious nature of the insurer's conduct in that case. The *Hatch* court observed that:

[a]ppellants were required to file an extremely detailed inventory of items that were in the

### i. *Filing Suit*

■ The defendants' first allegation is that the plaintiff's act of filing this suit for declaratory relief is, in and of itself, evidence of bad faith. The defendants, however, have retreated from this position, stating in their brief that "WCRS concurs with ISLIC's suggestion that merely filing a Declaratory Judgment action is not, by itself, sufficient evidence of bad faith ..." WCRS' Brief in Opposition to Plaintiff's Motion for Summary Judgment Concerning Bad Faith, Feb. 1, 1994, at 13. Although this issue has never been decided by the state supreme court, the defendants' concession appears to have been correct in light of the persuasive authority on this matter. One federal district court succinctly made this point, albeit in the context of a claim for substantive first-party bad faith, stating:

> to the extent a claim of bad faith rests entirely upon the filing of a declaratory judgment action, the bad faith claim would be unsupportable [sic]. All courts, including this court, have recognized and condoned the use of declaratory judgment actions by insurers. *Therefore, merely invoking the right to a declaratory judgment action does not, in and of itself, support an action for bad faith.*

*State Farm Fire & Cas. Co. v. Trumble,* 663 F.Supp. 317, 320 (D.Idaho.1987) (emphasis added); *accord Zurich Ins. Co. v. Killer Music, Inc.,* 998 F.2d 674, 680 (9th Cir.1993) (interpreting California law) (citation omitted). Absent a showing by the defendants that the plaintiff filed this suit for an improper or illegitimate purpose, a showing that has not been made in this case, it is clear that the mere fact of filing suit, standing alone, is not evidence of bad faith.

### ii. *The "Service of Suit" Clause*

■ The defendants' second argument is that the plaintiff violated the service of suit clause contained in the policy and that this is

house at the time of the fire, consisting of 275 pages. For example, they were told that they must list how many cornflakes were left in the cereal box before the fire, and how much salt was in the salt shaker.
*Hatch,* 842 P.2d at 1098.

evidence of bad faith. Both of these contentions are without merit.

A service of suit clause in an insurance contract essentially provides that if the insurer fails to pay an amount claimed by the insured under the policy, then the insurer will submit the dispute to the jurisdiction of any court of competent jurisdiction "at the request of the insured." In addition to the fact that ISLIC has not "failed" to pay an obligation claimed under this policy by virtue of this Court's conclusion that no coverage existed, it is equally apparent that the service of suit clause is inapplicable to the case at bar for two reasons.

First, the purpose behind a service of suit clause is to protect the insured from having to litigate in an inconvenient forum selected by the insurer. In the present case, however, the forum selected was Wyoming, the insured's home state. As a result, the defendants have not been prejudiced by any alleged violation of this clause since suit was filed here in Wyoming.

Second, and perhaps more importantly, this lawsuit was initiated by the insurer, not the insured. It follows from the preceding discussion that if the litigation is initiated by the insurer, then the service of suit clause is irrelevant. This was the precise holding of *International Ins. Co. v. McDermott, Inc.*, 956 F.2d 93, 95–96 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992), where the Fifth Circuit held that although a prior precedent spoke to the issue of a service of suit clause when the insured filed suit, the case before it involved suit by the insurer. The Court went on to find that "when the action is first instituted by the insurer, the Service of Suit clause *simply has no application.*" (emphasis added).

### iii. *Discovery Matters*

■ The defendants' final argument in support of its procedural first-party bad faith claim is, broadly phrased, that plaintiff's counsel's "litigation conduct" in defending this suit, in regards to particular discovery

matters relative to the bad faith issues, has been malicious and oppressive. There are several valid reasons to reject these claims.

First and foremost, the purpose behind *Hatch* is to deter insurers from engaging in "oppressive and intimidating *claim practices.*" *Hatch*, 842 P.2d at 1099 (emphasis added). Thus, *Hatch* applicability beyond the context of insurance claims practices is questionable. In addition to the fact that neither *Hatch* nor any case cited by counsel for the defendants supports the defendants' fairly dramatic proposition that *Hatch* extends litigation-oriented misconduct by counsel for the insurer, the few courts that have considered this issue have uniformly rejected this argument, concluding that the implied covenant of good faith and fair dealing has no application in this setting. *See, e.g., Palmer v. Farmers Ins. Exch.*, 861 P.2d 895, 914 (Mont.1993); *FDIC v. Aetna Cas. & Sur. Co.*, 903 F.2d 1073, 1079–80 (6th Cir.1990). The Court finds these opinions persuasive.

These cases are founded in the classic common-law tradition, and they recognize the proper role for common-law courts in adapting to changing circumstances when no other relief is available. They recognize that the implied covenant of good faith and fair dealing that supports a claim for first-party bad faith was imposed by common-law courts in an effort to level the playing field between insurers and insureds, in recognition of the unequal bargaining power between those parties.

In contrast, claims alleging *litigation* misconduct are an entirely different creature. *Assuming*, without deciding, that counsel for the plaintiff were in fact engaging in such misconduct, it is clear that there are various remedies available to a litigant who wishes to redress allegations of unfair or improper litigation conduct by opposing counsel under the Federal Rules of Civil Procedure. Those rules provide numerous options to civil litigants, such as motions to strike under Rule 12(f),[21] protective orders under Rule 26(c) and motions to compel discovery under Rule 37. As the *Palmer* court correctly pointed

---

**21.** Counsel for the defendants are clearly aware of this particular alternative as they have filed

Rule 12(f) motions on April 4th and 5th.

out, "[t]he Rules of Civil Procedure control the litigation process, and, in most instances, provide adequate remedies for improper conduct during the *litigation process.*" *Palmer,* 861 P.2d at 914 (emphasis added). While the Wyoming Supreme Court has never squarely addressed the precise issue of whether allegations of litigation misconduct fall within the scope of *Hatch,* that court's jurisprudence in other areas sheds some light on its underlying philosophy regarding the extension of common-law doctrines like the covenant of good faith and fair dealing into unchartered waters.

For example, although the Wyoming Supreme Court has adopted a narrow exception to the at-will employment doctrine in the form of a tort action for wrongful discharge in violation of public policy, *see Allen v. Safeway Stores, Inc.,* 699 P.2d 277, 282–84 (Wyo.1985), the *Allen* court expressly stated:

[a] tort action premised on violation of public policy results from a recognition that allowing a discharge [allegedly in violation of some well-established public policy] to go unredressed would leave a valuable social policy to go unvindicated. *If there exists another remedy for violation of the social policy which resulted in the discharge of the employee, there is no need for a court-imposed separate tort action premised on public policy.*

*Id.* at 284 (emphases added). While not directly apposite, *Allen* is nonetheless instructive because it exposes the position of the state supreme court's own perception of its law-making function. The clear import of *Allen* is that while "court-imposed" remedies may be necessary in certain circumstances, they are an unwarranted exercise of the judicial prerogative when other avenues of redress, exist.

Applying this reasoning to the case at bar, it is clear that the "court-imposed" covenant of good faith and fair dealing would probably not be extended to cover allegations of procedural first-party bad faith involving allegations of harassing and oppressive litigation conduct because of the other avenues of redress that exist.

Finally, it must be noted that yet another reason exists for finding that allegations of litigation misconduct do not support a claim under *Hatch.* Claims of this type are not even directed at the insurer *per se,* but rather are focused at counsel for the insurer. Aside from the fact that the purpose of the covenant of good faith and fair dealing, namely, deterrence of these claims practices by insurers and their adjusters, would not be furthered by applying it to *counsel* for the insurer, it is clear that such an unwarranted imposition of liability might have a chilling effect on insurers, which could unfairly penalize them by inhibiting their attorneys from zealously and effectively representing their clients within the bounds permitted by law. *See Palmer,* 861 P.2d at 914.

In sum, the tort action of procedural first-party bad faith was never intended to be a panacea for all litigation-related problems. This is especially true given the remedies and sanctions available under the Federal Rules of Civil Procedure for so-called litigation misconduct. For all of these reasons, the Court finds that the defendants' claims of litigation misconduct do not provide any evidence in support of their claim of procedural first-party bad faith under *Hatch.* Therefore, in light of the absence of any evidence to support the defendants' allegations of procedural first-party bad faith, the plaintiff's motion for partial summary judgment is warranted.

### 2. Third–Party Bad Faith

#### a. Controlling Legal Standards

In addition to the causes of action for first-party bad faith discussed above, the defendants have alleged another separate bad faith cause of action, known as third-party bad faith. This tort, like the first-party bad faith torts, is asserted by an insured against its insurer, but it does not involve the insurer's alleged bad faith refusal to pay benefits directly to the insured pursuant to a contractual obligation in the policy itself. Rather, third party bad faith involves the insured's claim that the insurer "fail[ed] to exercise good faith in *settling* a claim or claims asserted against the insured by [a] third part[y]." Glenn E. Smith, *Understanding the Tort of Third–Party Bad Faith in Wyoming: Western Casualty & Surety Com-*

*pany v. Fowler Revisited,* 26 LAND & WATER L.REV. 636, 638 (1991) (emphasis added) [hereinafter Smith, *Bad Faith* ].

This tort also stems from the implied covenant of good faith and fair dealing, but serves a different purpose than the first-party bad faith torts. The common law tort of third-party bad faith was developed in response to the fact that insurers often face an inherently conflicting situation with respect to policy-limits settlement offers made by third party claimants against one of the insurer's policy-holders. If the insurer assumes the defense under a "duty to defend" clause or something analogous to it, then the insurer obtains, as a necessary corollary to assuming the defense, the sole and exclusive right to decide whether to settle a particular claim asserted against its insured within the limits of the latter's policy. In these situations, the insurer will often have an economic incentive to reject a particular settlement offer because its financial interests will conflict with, and usually diverge from, the insured's interests. Obviously, the insured would prefer that the insurer settle the claim within the limits of the policy in order to avoid the risk of a judgment in excess of the policy limits, which would subject the insured to the undesirable risk of personal liability for the amount in excess of the policy limits. *See id.* at 643–47 (discussing the basis for the third-party bad faith cause of action); *see also Clearwater v. State Farm Mut. Automobile Ins. Co.,* 164 Ariz. 256, 792 P.2d 719, 722–23 (1990).

The tort of third-party bad faith has thus been adopted in many jurisdictions in an effort to harness the insurer's exclusive settlement power and to control the intrinsic conflict of interest facing the insurer vis-à-vis the interests of its insured. *See generally* Smith, *Bad Faith,* at 646–47 (discussing the seminal decisions in *Hilker v. Western Auto Ins. Co.,* 204 Wis. 1, 235 N.W. 413, 414 (1931)

and *Brassil v. Maryland Cas. Co.,* 210 N.Y. 235, 104 N.E. 622 (1914)). Although the parameters of this tort are far from certain or uniform among the various jurisdictions that have recognized it, *see generally* Smith, *Bad Faith,* at 648–68, what is clear is that this tort was designed to counter the imbalance of bargaining power between the insurer and the insured and to make an insurer's "bad faith" refusal to consider legitimate policy-limits settlement offers actionable as a breach of the implied covenant of good faith and fair dealing.

Although the status of this cause of action in Wyoming was unclear after *Western Cas. and Surety Co. v. Fowler,* 390 P.2d 602 (Wyo.1964),[22] it appears now to be established that the Wyoming Supreme Court in fact recognizes the tort of third-party bad faith. In *First Wyoming Bank, N.A. Jackson Hole v. Continental Ins. Co.,* 860 P.2d 1064 (Wyo.1993), the Wyoming Supreme Court recognized, albeit in the context of a discovery dispute, that there was "a potential difference between first-party and third-party bad faith concepts." *Id.* at 1091–92 n. 10 (citations omitted). In *JBC of Wyoming Corp. v. City of Cheyenne,* 843 P.2d 1190 (Wyo.1992), then-Justice Urbigkit's concurrence stated that the tort of delay or non-payment "addresses the same generic rationale as first-party or third-party bad faith torts which we considered in [*McCullough*] ... (first-party) and in [*Fowler*] ... (third-party bad faith failure to settle)." *Id.* at 1199 (Urbigkit, J., specially concurring). Finally, in *Herrig v. Herrig,* 844 P.2d 487 (Wyo.1992), the Court made it clear that *Fowler* had in fact adopted this cause of action. Citing *Fowler,* Chief Justice Macy, writing for a unanimous court, expressly held that "[a] cause of action for 'third party' bad faith will lie when a liability insurer fails in bad faith to

---

22. As Mr. Smith's article points out, the Wyoming Supreme Court's opinion in *Fowler* simply assumed that a cause of action would lie for an insurer's bad faith refusal to settle a policy-limits claim against its insured; the Court did not expressly adopt this cause of action in that case. The litigants simply "assumed that a cause of action for third-party bad faith existed in Wyoming before it was ever actually established at the appellate level." Smith, *Bad Faith,* at 639.

Mr. Smith points out that the two narrow issues before the *Fowler* court were whether there was sufficient evidence to show a bad faith refusal to settle, and whether the trial court properly instructed the jury on the definition of bad faith. *See* Smith, *Bad Faith,* at 639 (footnote omitted).

settle a third-party claim within policy limits against its insured." *Id.* at 490. On the strength of these cases, it is apparent that this cause of action is cognizable in Wyoming.

While such conduct may be actionable, however, the discussion below illustrates that the elements of this cause of action have never been expressly defined by the state supreme court. The only Wyoming decision discussing the contours of this claim in any detail is the now thirty-year old decision in *Fowler*, which was decided before this tort gained acceptance in other jurisdictions. Although the particular facts of *Fowler* demonstrate a rather textbook example of third-party bad faith, the Court's opinion did enumerate some important considerations regarding third-party bad faith that provide a good starting point for this Court's analysis.

The plaintiff in *Fowler* was employed by the insured. He was injured when he fell from a ladder, and there was substantial evidence tending to show that the employer was negligent in furnishing the plaintiff with an unsafe ladder. The plaintiff, the third party claimant, later made a settlement offer of $2,813.80, well within the employer's $10,000.00 policy, but the insurer, who had expressly assumed the defense of these claims and the corresponding right to accept or reject a settlement offer, refused the offer because it felt that the claim was worth only $500.00.

The plaintiff subsequently filed suit against the employer and the jury found that the employer was negligent and awarded the plaintiff $18,102.50 in damages. In order to avert an appeal thereafter, the plaintiff accepted an offer of $15,000.00 in full satisfaction of the judgment. The insurer then paid the plaintiff the $10,000.00 of the employer's policy, leaving the employer exposed to a residual obligation of $5,000.00.

The employer thereafter filed suit against its insurer in an effort to recover the $5,000.00 that it became personally obligated to pay the plaintiff as a result of the judgment and subsequent settlement in the underlying negligence suit. The insured

claimed that the insurer acted in bad faith in refusing to settle the plaintiff's claim against it for $2,813.80. The insured further alleged that the insurer's rejection of this reasonable[23] policy-limits settlement offer resulted in the insured being subjected to a judgment that was $8,012.50 in excess of the policy limits.

In a subsequent suit between the insured and the insurer, the jury found for the insured and awarded $5,000.00 in damages. Thus, the narrow issues on appeal were whether the insured could collect this judgment against the insurer for the latter's alleged bad faith refusal to accept the plaintiff's policy-limits settlement offer regarding the claim against the insured.

In affirming the jury's verdict, the Wyoming Supreme Court approved of the trial court's instruction to the jury that it was the insurer's duty:

> to exercise *intelligence, good faith, and honest and conscientious fidelity* to the common interest of the [insured] as well as [its own interest] and give *at least equal consideration* to the interest of the insured, and if it fails to do so, it acts in bad faith.

*Fowler*, 390 P.2d at 606 (emphases added). The Court went on to state that:

> the insurance company had a right to take into consideration its own financial interest as well as the duty to take into consideration the interest of the insured.... [G]ood faith mean[s] a bona fide belief that the insurer had a good possibility of winning the lawsuit or that the [third party] claimant's recovery in the lawsuit would not exceed the limits of the insurance policy.

*Id.* Guided as best as possible by these rather amorphous and undefined criteria, which remain as the only authoritative pronouncement of this cause of action by the Wyoming Supreme Court, the Court will now address the merits of the outstanding motions.

---

**23.** The Court noted that the plaintiff's settlement offer only sought recovery for actual hospitalization costs, medical bills, lost wages and other expenses directly attributable to the plaintiff's injury. *See Fowler*, 390 P.2d at 605.

### b. *Application in this Case*

The Court has carefully considered the arguments and the briefs of the parties on the third-party bad faith issue, including the defendants' motion for certification of issues to the Wyoming Supreme Court and the plaintiff's opposition thereto. The Court's conclusion, discussed below, is that the plaintiff is entitled to summary judgment on this claim as well, and that the defendants' motion for certification of issues to the Wyoming Supreme Court must be denied. While *Fowler* provides little in the way of flushing out the essential elements of a prima facie cause of action for third-party bad faith, the defendants have simply failed to offer any proof on the critical threshold question regarding the plaintiff's assumption of the defense. As a result, regardless of the precise contours of this claim, it is apparent that the defendants' cannot establish that the plaintiff committed this tort of third-party bad faith as a matter of law in this case.

### i. *Can There Be Liability if the Insurer Does Not Assume the Defense?*

■ ISLIC's motion for summary judgment on the question of third-party bad faith asserts that "[u]nder Wyoming law, in order to state a claim for bad faith failure to settle [i.e., third-party bad faith], the insured must establish as a threshold matter that the insurer either assumed the defense of the underlying claim or breached the duty to defend." ISLIC's Memorandum of Points and Authorities in Support of Motion for Summary Judgment on Bad Faith, Dec. 13, 1993, at 2. In support of this proposition, ISLIC relies on Mr. Smith's article.

To be sure, Mr. Smith's article does refer to "assumption of the defense by the insurer" as an "element" of this cause of action. Shortly thereafter, he states that "[o]rdinarily, the insurer must assume the defense of a claim before it has any obligation to settle clams within the policy limits." Smith, *Bad Faith*, at 648 (footnote omitted). The very next paragraph, however, states:

[t]he above 'elements' of the third-party action, however, are not entirely without controversy or exception. *As will be seen below, it may not be necessary for the insurer to assume the defense before it can be found liable for violating its duty to settle.*

*Id.* The defendants rely on this language in support of their position that ISLIC can still be liable for the tort of third-party bad faith even if the plaintiff has not assumed the defense. The defendants' argument is misplaced. The italicized language above refers to the one particular set of circumstances when an insurers fails to assume the defense of the insured based on a good faith belief that it had no duty to defend. The question is whether the insurer may be held liable for third-party bad faith under these circumstances.

The leading case on this point is *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958), where the California Supreme Court held that:

[w]e do not agree with the cases that hold there is no liability in excess of the policy limits where the insurer, believing there is no coverage, *wrongfully refuses to settle the claim. . . .* An insurer who denies coverage does so *at its own risk,* and, although its position may not have been entirely groundless, *if the denial is found to be wrongful* it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract.

*Id.* 328 P.2d at 201–02 (citations omitted) (emphasis added).

*Comunale* involved a situation where the insurer wrongfully failed to assume the defense because it concluded, albeit wrongfully, that the policy did not extend to the claims asserted. *Comunale* is, however, inapposite to the claims asserted in this case for the simple reason that the plaintiff's refusal to defend the action here was not wrongful. Rather, its refusal to defend its insured was predicated on the fact that the policy was clear and unambiguous in stating that the insured possessed the duty to retain counsel and defend the action, subject to indemnification by the plaintiff after the fact. In *Comunale*'s own terminology, regardless of whether ISLIC's decision to proceed "at its own risk" in this case was a wise decision, its

refusal to consider the settlement offers at issue in this case was not *wrongful*, like it was in *Comunale*, because there was no assumption of the defense here. The California Supreme Court reasoned that:

> [c]ertainly an insurer who not only rejected a reasonable offer of settlement but also wrongfully refuses to defend should be in no better position than if it had assumed the defense and then declined to settle. The insurer should not be permitted to profit by its own wrong.

*Id.* Thus, it would certainly be anomalous to hold that although ISLIC's conclusion that there was no duty to defend was correct, it may nonetheless be held liable for this correct prediction. The critical point is that because ISLIC did not assume the defense in this case, it never obtained the corresponding power to control settlements, which is the gravamen of this cause of action. Regardless of the wisdom of the *Comunale* decision, a question that should properly be addressed to the state supreme court in the first instance, that decision is clearly distinguishable from the facts of this case. Because ISLIC's gamble was favorable to it, no liability can attach for its refusal to settle because its decision was not wrongful.

### ii. Assumption of the Defense Compared to Denial of Coverage

Counsel for the defendants rely on another decision of the California Supreme Court in *Johansen v. California State Auto. Ass'n Inter–Ins. Bur.*, 15 Cal.3d 9, 123 Cal.Rptr. 288, 538 P.2d 744 (1975) in support of their third-party bad faith argument.

In that case, the insurer, in accordance with the terms of the policy, expressly assumed the insureds' defense of the action. *Id.* at 12, 123 Cal.Rptr. 288, 538 P.2d 744. After having assumed the defense, however, the insurer concluded that the terms of the policy did not extend to the particular claims asserted by the third party claimants against the insured.[24] As a result of its position as

to coverage, the insurer refused to consider policy-limits settlement offers, which resulted in a judgment against the insureds in excess of the policy limits. In a subsequent declaratory judgment action, however, the California courts concluded that the insurer's conclusion regarding coverage was erroneous and that the policy did in fact cover the claims asserted against the insureds. *Id.* As a result, the insurer paid the third party claimant the limits of the policy but refused to accept liability for the excess amount. The insureds then assigned their rights against the insurer to the third party claimant—in order to allow the claimant to recover the excess judgment—and in consideration for this assignment, presumably[25] gave the insured a covenant not to execute with respect to the excess over the policy limits. *Id.*

The issue before the California Supreme Court was whether the insurer's refusal to consider a legitimate, policy-limits settlement offer based on its conclusion that there was no coverage was actionable as third-party bad faith. The *Johansen* court's ultimate conclusion, adequately paraphrased by Mr. Smith, was that:

> the insurer's belief that the policy does not provide *coverage* cannot be allowed to affect *the insurer's decision as to whether a policy limits settlement offer should be accepted.* Instead, the insurer should evaluate the settlement offer as if there was *no doubt about coverage and reserve the defense of non-coverage if necessary.* In a separate action, the insurer may then seek reimbursement from the insured if it should succeed in establishing a lack of coverage.

Smith, *Bad Faith*, at 669 (paraphrasing the holding of *Johansen*, 15 Cal.3d at 19, 123 Cal.Rptr. 288, 538 P.2d 744) (footnote omitted) (emphasis added). *Johansen* is, however, clearly inapposite to the case at bar.

As indicated above, *Johansen* involved the question of whether an insurer, *who conceded*

---

24. *Comunale* thus differs from *Johansen* in that *Comunale* involved the issue of the insurer's refusal to assume the defense, whereas the insurer in *Johansen* did assume the defense, but contended that there was no coverage under the policy.

25. The word "presumably" is used because the *Johansen* opinion does not state whether the third party claimant gave the insured a covenant not to execute, even though it seems logical to suppose that one was given.

*that it had a duty to defend,* could be found liable for wrongfully refusing to consider legitimate policy-limits settlement offers because it concluded that the policy did not provide coverage for the underlying claims. The California Supreme Court answered that question in the affirmative, holding that once the insurer assumes the defense, it cannot rely on a defense of "no coverage" to avoid any potential liability for bad faith refusal to settle. The Court reasoned that the more prudent course under these circumstances is for the insurer to assume that coverage existed and to reserve the defense of non-coverage so that if its prediction that the policy did not cover the claims asserted by the third party claimant against the insured was correct, it could then initiate suit against the insured for reimbursement of the funds that were paid out.

The *Johansen* court's conclusion, however, is predicated on the fact that, by virtue of having assumed the defense, the insurer possessed the exclusive authority to decide whether to consider a reasonable, policy-limits settlement offer, regardless of the merits of the coverage issues. In other words, because the insurer assumed the defense, the insured could no longer settle the case itself; the fact that the insurer wrongfully concluded that the policy did not provide coverage was simply not a valid defense.

If the *Johansen* decision is framed in terms of risk allocation and public policy, then the issue becomes whether an insurer should be required to consider a policy-limits settlement offer when it disputes coverage, with the right seek reimbursement after-the-fact if a court subsequently concludes that there was no coverage, or whether the insured should face the prospect of a judgment in excess of the policy limits because the insurer refused to consider a policy-limits settlement offer simply because it believes that the policy does not cover the underlying claims. *Johansen* adopts the first position espoused above, namely, that if the insurer assumes the defense, then its interest in disputing coverage is, as a matter of sound policy, necessarily subordinate to the insured's interest in being shielded from the risk of an adverse judgment in excess of the

policy limits. Therefore, insurers who want to dispute coverage are better advised, at least in California, at least to consider reasonable settlement offers, and if necessary, pay the claimant in satisfaction of the claims against the insured, while simultaneously reserving its rights to seek reimbursement from the insured if the policy is later held not to cover the underlying claims.

Society thus finds it both preferable and desirable, as a matter of public policy, to minimize the risk of personal liability against an insured and to require the insurer to consider legitimate settlement offers even if it disputes whether coverage exists. Insurers who want to challenge coverage should at least keep an open mind and consider reasonable settlement offers, rather than flatly refusing to consider them because such a position will expose their insureds to an increased risk of personal liability.

The insurer is in a better economic position than most insureds. Therefore, it is not unreasonable to allocate the burden of considering claims and paying them out, when necessary, to the insurer, subject to the caveat that reimbursement may be available at a later date, rather than subjecting individual insureds to personal liability since most insureds are not financially capable of withstanding personal liability under these circumstances.

In the present case, however, the critical fact underlying this whole discussion is absent: the insurer, ISLIC, never assumed the defense of WRI in the suit brought by WCRS. The policy at issue was an indemnification policy that specifically provided that "[i]f defense of a suit shall be required then *the Insured* shall appoint counsel." ISLIC Policy, · § 9 (emphasis added). *Johansen* found that a cause of action for third-party bad faith can be grounded in the insurer's consideration of coverage issues *after it has already assumed the defense.*

Thus, the defendants' argument boils down to a non-sequitur: on the one hand, the plaintiff had no duty to defend, and thus did not possess the sole and exclusive power to settle the claims asserted by WCRS against WRI, which is the sina qua non and the reason why the tort of third-party bad faith

exists. On the other hand, however, the defendants assert that the insurer should still be required to consider reasonable policy-limits settlement offers when it disputes the coverage, as it did in this case, even if it has never assumed the defense. The flaw in this reasoning is apparent.

The insured cannot have it both ways. If the insurer assumes the defense, then it and it alone has the duty to consider settlement and to give at least "equal consideration," however that term is defined, *see* Smith, *Bad Faith*, at 666–72, to the interests of the insured under *Fowler*. If, however, the insurer never assumes the defense, then the corresponding obligation to consider policy-limits settlement offers that comes with the assumption of the defense has not attached, and the insurer is thus excluded from the negotiation process.[26] In other words, if the insurer never assumed the defense, then the insured still retained the ability to settle the underlying claims. It follows *a fortiori* that the insurer cannot be held liable for its alleged failure to consider a settlement offer that it was not empowered to consider because it had not assumed the defense. Thus, while *Johansen* seems logical and prudent as a matter of public policy, certification on the question of whether this rule would become the law of Wyoming is unwarranted here precisely because the insurer never assumed the defense, thereby taking this case outside of *Johansen*.

Viewed in terms of risk allocation, the defendants' argument attempts to shift a non-existent risk to the plaintiff. The risk is non-existent in this case because of the simple fact that the insurer never assumed the defense, a fact that underlies the entire doctrinal basis for the implied covenant of good faith and fair dealing. This covenant is imposed by law because of the inherent conflict of interest that an insurer faces when it assumes the defense of a claim against its insured. This conflict of interest does not manifest itself when the insurer has not assumed the defense.

For all of these reasons, it is clear that the defendants' claim for third-party bad faith must fail as a matter of law.[27]

**THEREFORE,** it is

**ORDERED** that the Defendants' Motions for Partial Summary Judgment be, and the same hereby are, **DENIED.** It is further

**ORDERED** that the Plaintiff's Cross–Motions for Summary Judgment be, and the same hereby are, **GRANTED.** It is further

**ORDERED** that the Plaintiff is entitled to declarations that no coverage existed and that it cannot be liable for bad faith under these circumstances, as per the terms of this order. It is further

26. Under section IX of the policy, ISLIC does retain a right to consent to any proposed settlement that would require it to pay out policy proceeds. Nonetheless, this right to consent is distinct from saying that the insurer possesses the exclusive right to control the negotiations.

27. This Court's conclusion is that because the plaintiff never assumed the defense of this action, the defendants cannot establish a breach of the implied covenant of good faith and fair dealing as a matter of law.

As a result, this Court need not, and does not, decide any of the other remaining issues on the third-party bad faith claim. It is worth noting, however, that the law regarding the tort of third-party bad faith in Wyoming is still very much unsettled. While subsequent cases, especially *Herrig*, make it clear that this tort is indeed viable in Wyoming, the elements of this cause of action are unsettled.

Specific and important issues still remain unanswered, including: (1) is this an intentional tort akin to first-party bad faith under *McCullough* and its progeny, or is some less culpable state of mind sufficient to constitute bad faith, *see* Smith, *Bad Faith*, at 657–66; and (2) what significance, if any, should be attributed to the obiter dicta contained in *First Wyoming Bank, N.A. Jackson Hole v. Continental Ins. Co.*, 860 P.2d 1094, 1101 (Wyo.1993), in referring to the "fairly debatable" standard in the context of a third-party bad faith claim, especially in light of the fact that the "fairly debatable" standard seems difficult to reconcile with the "equal consideration" language of *Fowler*. See *Clearwater*, 792 ·P.2d at 722–23 (comparing first-party and third-party bad faith and concluding that "although the 'fairly debatable' standard sufficiently protects both parties' interests in first-party actions, *it inadequately protects the insured's interests in third-party actions.*") (emphasis added).

These issues, however, need not be resolved at this time. Nonetheless, when it is time for these questions to be answered, the body that should make those decisions in the first instance is the Wyoming Supreme Court, and not this Court.

**1536**

**ORDERED** that the Plaintiff shall be entitled to recover its costs incurred in this matter.